UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Criminal No.  06-349 (JDB) |
| | : |
| v. | : |
| | : |
| DOUG MAIRENA, | : |
| Defendant. | : |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits the following memorandum in aid of sentencing.

### INTRODUCTION

From 2003 to 2005, the defendant, Doug Mairena, embezzled money from the Federation of American Hospitals ("FAH"), where he worked as the Controller. The defendant's position at FAH allowed him to understand, and then bypass, the financial procedures and controls so that he could steal over $377,000 from his employer. In the factual background section, this memorandum discusses: *one*, how checks were paid at FAH; *two*, how the defendant evaded the financial controls and stole the money; and *three*, how the crime was discovered. In the legal analysis section, the government addresses both the issue of abuse of position of trust and the defense request for "downward departures" based on voluntary disclosure of the offense and extraordinary acceptance of responsibility. The government submits that the defendant, as the Controller, abused his position within FAH to conceal his embezzlement and the Court should sentence the defendant to a period of incarceration.

**FACTUAL BACKGROUND**

I. <u>How Checks Got Paid at FAH</u>

During the time of the embezzlement, FAH had two ways for vendor checks to be paid – that is, either computer generated through a printer or manually prepared on a typewriter. When a vendor invoice came into FAH, the supervisor responsible for that vendor's area would review and, if appropriate, sign the invoice authorizing it to be paid. This invoice would then be forwarded to the Controller. The Controller (the defendant) could input the invoice data into FAH's computer and prepare the "accounts payable" record which would generate a check in the correct amount due and owing to the vendor. Alternatively, the Controller (the defendant) could manually type the check on a typewriter rather than first entering the data into the computer system. While the defendant was the Controller, FAH used both methods for generating checks.

Once prepared, the check (prepared by either computer or typewriter) would be included in a package with the signed vendor invoice and presented to one of several persons at FAH authorized to sign checks. If the check were in an amount less than $2,000, only one signature would be required. Once signed, the check would be returned to the defendant to be mailed to the vendor.

Later, the defendant, fulfilling his duties as Controller, would review bank statements and cancelled checks when they returned to FAH from the bank. The defendant was responsible for reconciling the bank statements (packaging the bank statements with the reconcilations); the statements, checks, and any other records would be stored to be made available for auditors, if requested.[1]

---

[1] It is beyond dispute that the defendant was aware of the financial procedures at FAH. Indeed, it was the defendant himself who wrote the policies and procedure manual. Thus, the defendant knew the financial controls, *and* how to circumvent them.

## II.   How the Defendant Evaded the Financial Controls

### A.  How the Defendant Stole $377,000

To accomplish his embezzlement scheme, the defendant used the same vendor invoice and supporting documents to prepare *two* checks purporting to pay for the exact same expense. One check was generated by computer once the defendant correctly inputted the data for check preparation. This check was typically signed by the Chief Financial Officer. This (legitimate) check would be given to the vendor to pay in full the debt owed by FAH. Next, the defendant prepared a second check on a typewriter, using the same invoice and same supporting documents as with the check which had already been prepared and paid to the legitimate vendor. The defendant, or the co-schemer Mark Freeman, took this packet, containing the same supporting documents but with the second, manually prepared, check to a different authorized signator at FAH. Many of these fraudulent checks were signed by one particular senior vice-president, who remembers that the defendant often would come into her office with a "redwell" of checks to be signed, would wait for her to sign the checks, and would engage her in "chit chat" while she reviewed the packets and signed the checks.

After this second, illegitimate, check was signed, the defendant would insert the check back into the typewriter and then using the erasable ribbon, back out the name of the vendor. He would then re-type his own name as payee, or much less frequently, the name of his co-schemer, Mark Freeman. At times, the defendant would also increase the amount of the check to $2,000, or just under the $2,000 threshold. Through this method, the defendant falsely altered almost 200 FAH

checks, resulting in $377,029 of stolen money.[2]

### B.    How the Defendant Hid his Embezzlement

Once FAH's bank returned the falsely altered checks and the bank statements, the defendant destroyed the evidence of the crime by destroying the altered checks and, at times, other documents such as the bank statements or reconcilations associated with those checks.

In order to hide the macro evidence of the embezzlement scheme, the defendant would under-report the amount of deposits. For example, and for illustrative purposes only, the defendant recorded in FAH's books that he deposited $120,000 in member dues into the FAH's operating account, when, in truth, the defendant deposited $180,000. This excess money created a "slush fund" from which the defendant could embezzle without raising awareness of "missing" money.

Most significantly, the defendant was able to trick the auditors. He understood the extent of the year-end auditors' review; he was familiar and friendly with the auditors. Indeed, it was these auditors who had recommended that FAH hire the defendant into the position of Controller. Having been with FAH for several years, and having had the same set of auditors, the defendant knew that the auditors would review only the bank statements for January and December. Thus, the defendant greatly curtailed his embezzlements during the months of January and December. Setting aside 2003 (when the defendant only embezzled about $11,000), the defendant chose to embezzle money almost exclusively from February to November in the years 2004 and 2005 (of course, the defendant left the employment of FAH in November 2005, so he would not have had an opportunity to steal from FAH in December 2005).

---

[2]These figures, 200 of altered checks and $377,029 of embezzled money, include the checks to the defendant himself, and the ones that the defendant altered for the co-schemer, Mark Freeman.

In January 2004, the defendant embezzled only $1,525 from altering just one check.[3] In February 2004, however, the defendant altered eight checks to embezzle $15,620; in March 2004, he altered twelve checks for $23,202.[4] From February 2004 up to and including November 2004, the defendant altered 74 checks, or an average of about 7 checks per month to steal an approximate average of $14,250 each month. Then in December 2004, he paused. In December 2004, the defendant embezzled no money for himself, although he altered three checks for Mark Freeman.[5]

Again in January 2005 – there was no embezzled money and no altered checks. In February 2005, the defendant began his scheme again, with six altered checks to embezzle $11,890. From February 2005 to when he left in November 2005, the defendant altered a total of 89 checks, which averaged to about 9 checks per month for an embezzled monthly average of about $17,000. All in all, for 2004 and 2005, the defendant altered 163 checks for about $317,703 exclusively for himself (he altered additional checks and stole money for co-schemer Mark Freeman), but with virtually no embezzlement activity for January 2004, December 2004, and January 2005, the months which the defendant knew would be reviewed by the auditors. Graphed on a time line, the defendant's embezzlement activity for 2004 and 2005 look like this:

---

[3]There is one other $750 check which the forensic accountants labeled as "potentially fraudulent" dated January 2004, but this (and other) "potential fraudulent" amounts are not included in the embezzled funds for purposes of the plea, "loss" under Federal Sentencing Guidelines, or restitution.

[4]None of these amounts include the money from checks that the defendant altered for Mark Freeman.

[5]Again, two checks for about $1,415 dated in December are identified as "potentially fraudulent," but this money is not included as the fraud amount.



**III.    How the Embezzlement Scheme was Discovered**

As mentioned above, the defendant created "slush funds" by under-reporting deposits. In December 2005, which was after the defendant left FAH, the then-current controller noticed that a deposit had not been accurately reported. For example, instead of showing the actual $120,000 bank deposit in FAH's own ledgers, the defendant had recorded a deposit of $60,000. After consulting with others, the then-controller decided to leave the issue for the auditors.

Rather than following their usual procedures and looking at only December and January records, the auditors decided to examine bank statements and reconcilations for other months. When asked to provide the documents for the other months, however, FAH could not find bank statement reconciliation packets (including reconciliations and bank statements) from their operating account for several requested months. In response, the Chief Financial Officer ("CFO") reached out to the defendant to ask if he knew where these records might be stored. In an electronic mail sent to the defendant at his new job, dated Monday, February 6, 2006, the CFO wrote:

> I wanted to check with you and seek your help on one item
> that came up during the course of the audit. In compiling all
> the documents for the audit we were unable to locate
> the bank statement reconciliations for March 2005, June 2005,
> July 2005, and August 2005.

E-mail to Dmairena@NAREIT.COM, dated February 6, 2006 7:32 PM. When the defendant did not respond immediately, the CFO called and left a voice mail asking for a return call. The defendant called back, and when asked about the missing items, suggested that the statements and reconciliations could be misfiled in a different year's file. The CFO told the

defendant that they would look for the documents in the other years' filings. When FAH searched for the documents, they were not found.

In the meantime, the finance people at FAH also had asked their bank for copies of missing bank statements with the intent to look for checks which may have been negotiated but missing from their files. Although the date that FAH asked the bank for the statements is unknown, we do know that, in response, the bank sent copies of FAH's bank statements on January 23, 2006 via facsimile (defense has redacted copies of these statements). From these bank statements, the auditors looked for listings of checks which had been negotiated, but were missing from the FAH files. The finance people at FAH sent the bank the list of missing checks on February 24, 2006, and the bank sent a sample of the missing checks that same day (this is after the defense attorney advised the general counsel of the embezzlement, but before the general counsel talked with anyone else at FAH about the issue). Upon review of the previously missing checks, the finance people at FAH realized that the defendant had been giving himself checks worth thousands of dollars without justification and they then went to their general counsel to inform him of the apparent embezzlement.

## LEGAL ANALYSIS

**I.     The Defendant Used his Position of Trust as Controller to Conceal his Crime.**

The defendant, as Controller, had access to more information and possessed more authority than the typical FAH employee. Abusing his position of trust, the defendant used his power and knowledge to hide his crime. The D.C. Circuit set forth factors that should be considered in determining whether a particular position constitutes a position of trust. These factors are:

8

> The extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendants' level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

United States v. Robinson, 198 F.3d 973, 977 (D.C. Cir. 2000) (granting the two-level increase for the director of a school for emotionally disturbed students). The facts of this case meet the D.C. Circuit's standard. The defendant's job had very little oversight which allowed him to hide his embezzlement from FAH, and, in an ordinary year, from the auditors. The crime was not "readily" noticed because the defendant "cooked the books" to show less money in FAH's account than was available. Thus, when he stole money, it was not apparent, since the general ledger had not shown the accurate amount of member dues as deposits from the beginning. Most notable was the defendant's "specialized knowledge." He knew which months would be the subject of the audit. He did not steal during those months. Thus, the auditors would not have caught the fraud, except that in January 2006, they chose to abandon their typical audit and look at months beyond December and January.

Having the position of trust, the defendant then used his position "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. Section 3B1.3. The defendant here is similarly situated to the defendant in United States v. Chimal, 976 F.2d 608 (10th Cir. 1992), who was the comptroller of a hotel. In that case, Chimal altered deposit tickets and stole cash. The Tenth Circuit found the two-level enhancement for "abuse of position of trust" to be justified as Chimal was the comptroller, supervisor of the accounting department, and "had the ability to avoid detection over a long period of time." United States v. Chimal, 976 F.2d at 614. Like the defendant in Chimal, the defendant here was able to conceal his offense not

only from FAH but also from the auditors by using his position and access as Controller. Therefore, because the defendant's position as FAH's Controller facilitated the concealment of the embezzlement, the defendant's offense level should be increased by two levels for "abuse of position of trust" pursuant to U.S.S.G. Section 3B1.3.

## II.     The Defendant is Not Entitled to a "Downward Departure."

In his Objections to the Presentence Report, dated March 19, 2007, the defendant claims that he should get "a downward departure pursuant to Guideline 5K2.16 for Voluntary Disclosure of Offense [and] a downward departure for extraordinary acceptance of responsibility." Defense Letter to Probation dated March 19, 2007 at 1. The defendant is not entitled to a departure, or, in the more accurate nomenclature, variance, on either ground.

### A.     Defendant did not Voluntarily Disclose an Offense which Otherwise would have Remained Undiscovered.

Federal Sentencing Guidelines Section 5K2.16, cited by the defense, allows for a departure (or "variance"),

> [i]f the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise. . . *This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent.* . .

U.S.S.G. Section 5K2.16 (emphasis added).

In objecting to the Presentence Investigative Report, the defense claims that FAH did not know about the embezzlement until the attorney for the defendant informed the general counsel of FAH on February 22, 2006. (See Letter to Probation, dated March 19, 2007 at 2). Although the *general counsel* was not aware of the embezzlement when the defense attorney met with the

general counsel, the finance people at FAH had already: <u>one</u>: put into place actions which discovered the theft; and <u>two</u>: (unknowingly) notified the defendant that his embezzlement scheme was about to be revealed.  By the time that the defense attorney spoke with FAH's general counsel on February 22,, 2006, the finance people at FAH had: seen a discrepancy in the deposits; searched for the bank statement reconciliations for months other than December and January; and ordered and received the missing statements from the bank.  A few days after the defense attorney's meeting with the general counsel, and before the general counsel relayed his conversation with the defense attorney, the then-controller notified the general counsel that they had evidence of the embezzlement scheme.

In addition, it cannot be said that the "defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered." U.S.S.G. Section 5K2.16.  Before he approached an attorney, the defendant was aware that the discovery was imminent.  In early February 2006, the CFO informed the defendant that they were looking for bank statements and reconciliations beyond the typical December and January months.  On February 2, 2006, the CFO emailed, and then later spoke to the defendant to ask for bank reconciliations for March, June, July, and August 2005 – months when the defendant altered 51 checks in order to embezzle just over $100,000.  As the former Controller, the defendant understood that FAH would be obtaining copies of the altered checks from the bank to replace the checks that he had destroyed.  He foresaw that FAH would be discovering the embezzlement scheme.

Although the defendant clearly does not qualify for a downward departure or variance from the Federal Sentencing Guidelines under the "voluntary disclosure" provision, it cannot be denied that the defendant acted quickly in obtaining counsel.  Through his attorney, the defendant

assisted FAH to understand the mechanisms of the embezzlement scheme and identified the others involved (and equally important, *not* involved). In fashioning an appropriate sentence for this defendant, the government takes no position as to whether this assistance should be calculated into the factors enumerated by 18 U.S.C. Section 3553(a) ("the history and characteristics of the defendant").[6]

      **B.**    **Defendant is Not Entitled to "Extraordinary Acceptance" Reduction for Promise or Efforts to pay Restitution.**

The defense also requests a "downward departure" based on extraordinary acceptance of responsibility based on, in part, "willingness to begin making restitution." Defense Letter to Probation Dated March 19, 2007 at 3. No such reduction is appropriate. Under either a departure theory or a reduction for a "variance," it is simply inappropriate to reward the defendant for having the means to pay back some of the stolen money. To do so would be akin to awarding the well-off and educated because they are well-off and educated and punishing the poor because they are poor.

---

[6] We leave for another day (and another case) the issue of the definition of "authorities." To qualify for the "voluntary disclosure" departure, the Guidelines explicitly require that the defendant notify "authorities." ("If the defendant voluntarily discloses to *authorities*. . ." U.S.S.G. Section 5K2.16, emphasis added). At least one court has interpreted "authorities" as law enforcement, not a victim representative. In <u>United States v. Ekeland</u>, 174 F.3d 902 (7th Cir. 1999), the defendant defrauded his employer in a kickback scheme, but then confessed to his employer that he had committed the fraud. Later, Ekeland pleaded guilty and requested a departure pursuant to Section 5K2.16. Finding that "'authorities' as used in Section 5K2.16 refers only to legal authorities. . .persons having legal power to make and enforce the law," (174 F.3d at 905), the court rejected the defendant's request. The Court of Appeals agreed that Ekeland had disclosed his offense before discovery, but because Ekeland had notified his employer and not law enforcement, he was not entitled to a departure under Section 5K2.16.

The defense asks for a "departure." Yet in an earlier era, when courts looked at "departures" from the Sentencing Guidelines, it was only in "rare circumstances" where reductions for extraordinary acceptance of responsibility were allowed. United States v. Tucker, 386 F.3d 273 (D.C. Cir. 2004) (reversing and remanding a departure). Courts were then reluctant to treat a defendant who had the ability to make restitution differently than a defendant who was without financial resources, as it would result in sentencing disparities due solely to the socio-economic class of a defendant. See, United States v. Chastain, 84 F.3d 321, 325 (9th Cir. 1996) ("Allowing a sentencing judge to reduce a defendant's sentence to preserve a defendant's job and facilitate restitution would introduce precisely the type of socio-economic disparity into sentencing that the guidelines were designed to eliminate"); United States v. Shaffer, 35 F.3d 110, 115 (3rd Cir. 1994) ("A reduction of sentence because of a last minute payment of restitution would unfairly discriminate in favor of those with greater financial resources. . . [I]t is a hallmark of our sentencing scheme that criminal defendants who have committed identical crimes, and who have the exact same culpability, should be treated equally at sentencing . . . even though one has the means through business or personal relations to make restitution to the victim banks after he has been convicted. . . while the other does not"). See also United States v. Repking, 467 F.3d 1091 (7th Cir. 2006) (post-*Booker* sentence of one day was unreasonable and the payment of restitution did not justify the below-range sentence). The Federal Sentencing Guidelines were envisioned as a way to eliminate disparities in sentences among defendants. To discriminate based on wealth is simply unjust and unfair.

Furthermore, this defendant's efforts at restitution are not exceptional. Many white-collar defendants have the means, and thus the responsibility, to provide for restitution. Finally, to the government's knowledge, the defendant has not liquidated his assets in order to repay the victim in full. A defendant simply should not be allowed to "buy off" his prison sentence, thus avoiding punishment for his criminal activities. This defendant, a former Controller who had the advantages of a good education and well-paying job, is not entitled to any reduction in jail time merely because he has money to return to the victim.

## CONCLUSION

The government respectfully requests that the Court to sentence the defendant to an appropriate period of incarceration.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney


By: _____/s/_____
VIRGINIA CHEATHAM
Assistant United States Attorney
D.C. Bar No. 411980
Fraud/Public Corruption
555 4th Street, N.W., 5th Floor
Washington, D.C. 20530
(202) 514-9732

CERTIFICATE OF SERVICE

    I hereby certify that on this ___ day of April, 2007, that a copy of the foregoing Motion and Sentencing Memorandum was served via ECF to Leslie McAdoo, Esq., Counsel for the defendant.

                                            _____/s/_____
                                            VIRGINIA CHEATHAM
                                            Assistant U.S. Attorney