UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
                                 :
            Plaintiff            :
                                 :
      v.                         :        Criminal No. 1:06-CR-349
                                 :
DOUGLAS MAIRENA,                 :
                                 :
            Defendant            :

DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Pursuant to Fed.R.Crim.P. 32, the Defendant, Douglas Mairena, through counsel, respectfully submits the following information in aid of sentencing.

I.      Introduction

This is an unusual case.   Douglas Mairena is a first-time offender who misappropriated significant funds from his employer, an action totally at odds with his forty-year history of unblemished, good behavior.  He took these funds, not for the purpose of financial gain, but rather, because of psychological disturbance, in retaliation for what he perceived to be mistreatment by his employer.  Mr. Mairena voluntarily ceased his misconduct, later disclosed it to the victim, is truly remorseful for his conduct, and has accepted responsibility for his actions.

II.     The Legal Framework

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), sentencing in federal criminal cases is guided by the seven sentencing factors that Congress specified in 18 U.S.C. § 3553(a).  Those factors are:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

   (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)    to afford adequate deterrence to criminal conduct;

   (C)    to protect the public from further crimes of the defendant; and

   (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the advisory guideline range;

(5)    any pertinent policy statements issued by the Sentencing Commission;

(6)    the need to avoid unwarranted sentence disparities; and

(7)    the need to provide restitution to any victims of the offense.

The statute explicitly provides that the court shall impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in factor 2 (emphasis added).

"While the guidelines remain an important consideration in selecting a specific sentence, neither *Booker* nor the structure of the statute elevates them above the other § 3553(a) factors." *United States v. Cull*, 446 F.Supp.2d 961, 963 (E.D. Wis. 2006). Although, on appeal, a sentence within the United States

2

Sentencing Guidelines (the "Guidelines") range is considered presumptively reasonable, *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006),[1] the same is not true in the trial court. "A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence. To do so would be to take a large step in the direction of returning to the pre-*Booker* regime." *United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007); *see also*, *United States v. DeMaree*, 459 F.3d 791, 794 (7th Cir. 2006). Rather, the sentencing judge should "evaluate how well the applicable Guideline effectuates the purposes of sentencing in § 3553(a)." *Pickett*, 475 F.3d at 1353.

## III.    Mr. Mairena's Background and Character

Mr. Mairena is a true first-time offender. He has no criminal record – including arrests – of any kind. He is presently 40 years old. He has been married for 13 years and has two daughters, who are 11 and 9 years old. He does not consume alcohol excessively and has never used any illegal drugs. He served honorably in the United States Army National Guard from 1985 to 1988.

Mr. Mairena's family immigrated to the United States from Nicaragua in 1972, when Mr. Mairena was 6 years old. Mr. Mairena became a United States citizen on May 21, 1992. Mr. Mairena attended J.E.B. Stuart High School in

---

[1] The Supreme Court has taken certiorari and heard argument on the question, but not yet decided, whether the presumption is correctly applied on appeal. *See Rita v. United States*, 177 Fed. Appx. 357, 2006 U.S. App. LEXIS 10850 (4th Cir. N.C., 2006), *cert granted*, 127 S. Ct. 551 (U.S., Jan. 5, 2007) (No. 06-5754).

Fairfax County, Virginia, graduating in 1985.  He attended Strayer College in Washington, DC, where he earned a Bachelor of Science degree in 1992.  In 2003, Mr. Mairena received a Masters of Business Administration from the School of Professional Studies in Business and Education at Johns Hopkins University in Baltimore, Maryland.  He has been steadily employed during his adult life, principally in the field of accounting.

Additional insight into Mr. Mairena's character and personality are provided by persons who have known him well for many years.  He currently serves as the church treasurer at Sleepy Hollow United Methodist Church in Falls Church, Virginia.  Sleepy Hollow United Methodist Church is aware of the instant case; its members have nevertheless expressed willingness to have Mr. Mairena continue in that volunteer role.  The Rev. Pamela Clark-Eagan, Pastor, describes Mr. Mairena as "a faithful husband, father, compassionate human being and a most loyal friend." She acknowledges that Mr. Mairena has disclosed his actions in this matter to her, that they have discussed it many times, and that Mr. Mairena has expressed sincere remorse for his conduct.  *See* Exhibit. 1.

Another friend at Sleepy Hollow United Methodist Church, Mr. G. Stephen Reynolds, is the finance chairperson of the church and has known Mr. Mairena for a year and a half.  Also acknowledging that Mr. Mairena has disclosed his conduct in this matter to him, Mr. Reynolds states that he holds the "utmost faith in [Mr. Mairena's] accounting and finance abilities" as treasurer and that "the loss of his talents would be significant to the church."  *See* Exhibit. 2.

4

Yet another friend, Reginald L. Johnson, who has known Mr. Mairena both personally and professionally for the past twelve years, says that Mr. Mairena has "always conducted himself with the highest ethical and professional standards" and is "remorseful for what he has done." *See* Exhibit. 3.

Mr. Mairena's many favorable qualities and actions do not diminish the misconduct for which the Court will sentence him. However, they do provide a more comprehensive picture of Mr. Mairena as a person. He is a fundamentally good and decent person who has made a serious mistake, for which he is deeply remorseful.

## IV.    Analysis

To determine the sentencing here, this court should first calculate the advisory Guideline range, then determine the extent to which any departures apply, and finally, apply the factors in Section 3553(a) to assist it in rendering the ultimate sentence.

### A.    The Sentencing Guidelines

In this case, the Guidelines calculation in the final PSR places Mr. Mairena at an offense level of 17, with a criminal history score of I. The resulting Guidelines range is 24-30 months and falls in Zone D.

Mr. Mairena objects to this calculation to the extent that it includes a two level enhancement under Section 3B1.3. (Abuse of a Position of Trust.) The PSR initially calculated the offense level at 15, which would result in a Guidelines range of 18-24 months, which Mr. Mairena did not dispute in his objections to the PSR.

The Government's objection to the PSR also did not dispute that calculation. However, the Government later filed a "revised" objection to the PSR seeking a two level enhancement for Abuse of Position of Trust, pursuant to Section 3B1.3. The Government's response was untimely, being submitted nearly two weeks after the deadline for objections to the PSR, without good cause. Thus, Mr. Mairena has moved to strike the Government's revised objection and he hereby also objects to the enhancement under Section 3B1.3 as being untimely without good cause. As noted in the Motion to Strike the revised objection, the Government has apparently simply changed its mind about pursuing the enhancement. All of the information relied upon by the Government for the enhancement has been in its possession or that of the Government since well before the filing of the information and plea in this case. The Government had more than ample time to evaluate its case and determine if an enhancement under Section 3B1.1 should be sought within the time allotted by Rule 32.

In addition, because the Government raised this revised objection at such a late stage in the proceedings, the defense has not had an adequate opportunity to conduct the necessary research to properly defend the proposed enhancement. For these reasons, Mr. Mairena asks that the Court decline to include the two level enhancement under Section 3B1.3 in the Guidelines calculation in this case.

### B.    Departures

The defense submits that downward departures are warranted in this case pursuant to Guidelines 5K2.16 for Voluntary Disclosure of Offense and 5K2.0 for

Extraordinary Acceptance of Responsibility.

     <u>Voluntary Disclosure</u>.  With respect to Mr. Mairena's voluntary disclosure of the offense, undersigned counsel disclosed the offense conduct, on Mr. Mairena's behalf and at his direction, to FAH on February 22, 2006 in a meeting with Jeff Micklos, FAH's in-house general counsel.  At that meeting, counsel specifically asked Mr. Micklos if FAH had become aware of Mr. Mairena's conduct and he said that he had no knowledge of it.  The Government, which was not notified of the situation until after Mr. Mairena's disclosure, was certainly unaware of Mr. Mairena's conduct before February 22, 2006, and Mr. Mairena knew that a disclosure of the misconduct could likely result in criminal prosecution.

The Government suggests that FAH had uncovered Mr. Mairena's embezzlement scheme prior to the voluntary disclosure to in-house counsel, Mr. Micklos.  However, a review of the relevant facts seems to suggest that while FAH may have discovered that it had accounting irregularities that needed to be explained prior to February 22, 2006, it did not realize before that date that the irregularities were necessarily the result of any misconduct or that Mr. Mairena was the source of any such misconduct.  In particular, a memorandum from the consulting company that FAH engaged to investigate Mr. Mairena's misconduct is instructive.  The memo, from FIT Consulting, Inc., dated May 22, 2006, states that FAH learned of the problem "when the former employee, Douglas Mairena, the former Controller of FAH,

declared he had misappropriated funds."[2]  And, while FAH had earlier sought copies of missing bank statements from Wachovia, those statements on their face do not indicate any embezzlement or the identity of an embezzler.  According to the information disclosed to the defense from the Government, FAH only received copies of cancelled checks that would have disclosed Mr. Mairena's identity as the embezzler on February 24, 2006, two days after the voluntary disclosure.[3]

The defense is not arguing that FAH had no idea that it had a cash variance that needed to be explained by mid February 2006.  And, the defense concedes that without Mr. Mairena's voluntary disclosure FAH may well have uncovered the scheme through diligent pursuit of the banking documents to resolve that discrepancy, and thereby also discovered that Mr. Mairena was the culprit.  The defense is saying that – in fact – on the date that Mr. Mairena chose to voluntarily disclose his misconduct, the available evidence suggests that FAH was NOT already aware of the true nature of the problem and that Mr. Mairena was the guilty party.  Thus, the disclosure in fact advised the victim of the offense, which is precisely what FAH told the auditors that it hired to conduct a review of the situation.

The Government suggests that regardless of whether the victim knew of the offense, Mr. Mairena disclosed it merely because he believed it was likely that he was going to be found out.  The defense does not believe that is quite right.  Rather, the situation is more subtle.  As explained more fully below, Mr. Mairena suffers

---

[2] A copy of the memorandum is attached as Exhibit 4.
[3] A copy of the letter from Wachovia transmitting for the first time to FAH copies of checks revealing Mr. Mairena as the endorser of suspected fraudulent checks, dated February 24, 2006 (and the checks), is attached as Exhibit 5.

from some significant psychological problems, which affected both his judgment in committing the offense and his assessments of the likelihood of discovery.

Mr. Mairena has been examined by psychiatrist, Dr. Sidney Brooks,[4] who has diagnosed Mr. Mairena as suffering from depression (with potential latent major depression and/or bipolar disorder), anxiety, and obsessive-compulsive personality disorder.[5] There is no doubt that Mr. Mairena suffered a great deal from the guilt caused by his misconduct and that his guilt was a motivating factor in his decision to reveal his misconduct, as Dr. Brooks documents. The defense intends to supplement its evidence as to Mr. Mairena's motivation for the voluntary disclosure at the sentencing hearing, with both testimony and some documentation, and in particular has requested an additional relevant document from the Government that is believed to be in the possession of the victim in order to do so.[6] The defense believes that the available evidence supports the conclusion that Mr. Mairena determined to and persisted in his decision to make the voluntary disclosure to the victim in order resolve the situation, rather than merely out of fear that he would soon be caught.

 Extraordinary Acceptance of Responsibility.  Mr. Mairena has also shown an extraordinary acceptance of responsibility in this case.  Guidelines Section 5K2.0 permits a downward departure in instances in which a factor taken into account in

---

4 Dr. Brooks' curriculum vitae is attached as Exhibit 6.
5 Dr. Brooks' report and forensic psychiatric examination are attached as Exhibits 7 and 8.
6 The Government and the defense have been working co-operatively on the exchange of documents and information relevant to the sentencing, and the defense is not anticipating a dispute regarding this additional document.

another section of the Guidelines exists to a degree not contemplated by that other section. Here, the degree of acceptance of responsibility that Mr. Mairena has shown is extraordinary and significantly exceeds that contemplated by Guidelines Section 3E1.1. The Court of Appeals has recognized that such a downward departure is permissible under the Guidelines in appropriate cases. *See United States v. Tucker*, 386 F.3d 273, 277 (D.C. Cir. 2004).

In October 2003, pursuant to the PROTECT Act, the Sentencing Commission amended the Guidelines to prohibit departures based on acceptance of responsibility. U.S.S.G. § 5K2.2(d)(2) (2004). However, because Mr. Mairena's offense spanned a period of time before and after this amendment, he would remain eligible for the departure under 5K2.0[7] - even without the change in the law wrought by *Booker* - because he has shown a degree of acceptance of responsibility not taken into account by the Guidelines in setting forth the conduct necessary to obtain the two or three level reduction under U.S.S.G. § 3E1.1 His extraordinary acceptance of responsibility here certainly can be granted additional consideration under the advisory guidelines regime created by *Booker*.

It is beyond peradventure that the courts should encourage offenders to disclose and mitigate their misconduct voluntarily and to accept responsibility for it. Here, Mr. Mairena did disclose his misconduct to the victim and immediately offered to make restitution. Even if, *arguendo*, Mr. Mairena believed his conduct

---

[7] The Guidelines cannot be applied to create an *ex post facto* effect. *See* USSG § 1B1.11(b)(1). *See United States v. Gaviria*, 116 F.3d 1498 (1997); *United States v. Thomas*, 114 F.3d 228 (1997).

was likely to be discovered by FAH, he nevertheless did not have to voluntarily come forward to admit his guilt.  He could have waited to make sure that the conduct would really be found out, as most offenders would have, and he could have denied his guilt during the government investigation and pre-charging stage of the case before ultimately concluding he had no choice but to plead guilty, as most offenders do.  That is not, however, what Mr. Mairena did.  Having decided to come forward, he has done so without looking back or retreating.  His statement of acceptance of responsibility to the Probation Officer as set forth in the PSR shows this clearly.

Finally, although the PSR plainly shows that he has little ability to do so, Mr. Mairena has already taken a significant step toward making restitution in this case.  He has already paid $70,000 to FAH toward the restitution amount.  This money was realized by drawing against the equity in his family's home, which is owned as tenants by the entireties with his wife.  Thus, again, Mr. Mairena is doing more than the typical defendant would do, and more than he could likely be legally required to do, in taking responsibility for his actions and trying to make amends.  His actions in this regard support a downward departure for extraordinary acceptance of responsibility.  *See e.g., United States v. Milne*, 384 F.Supp.2d 1309, 1312 (E.D. Wis. 2005) (granting reduction for extraordinary acceptance of responsibility based in part on voluntary payment of restitution).

In sum, because Mr. Mairena has done much more in this case than merely plead guilty after being charged and save the Government the burden of going to

trial, his actions warrant a downward departure from the Guidelines level for extraordinary acceptance of responsibility.

### C.    The § 3553(a) Factors

#### 1.    Nature of the Offense

The offense involved the embezzlement of money from the Federation of American Hospitals (FAH) over a period of more than two years. The total loss amount attributed to Mr. Mairena, as reported in the PRS is $328,960. Although the offense cannot be characterized as minor or isolated, it was not aggravated – it did not involve weapon possession, violence or threats.

#### 2.    Character of the Defendant

Mr. Mairena is a mature, responsible, hardworking person; a devoted husband and father. He has a criminal history score of zero. He has never engaged in any substance abuse. He has served his country honorably. He voluntarily contributes his skills in the service of others. On balance, he is fundamentally a good and decent person who has had a serious lapse in judgment due to frustration with his employer.

In order to try to understand what brought about the events that bring him before this Court, Mr. Mairena was evaluated by Dr. Brooks. These diagnoses were made for the first time through Dr. Brook's examination, as Mr. Mairena has never had any prior psychological evaluation, treatment or counseling. Dr. Brooks points out that these conditions are treatable through medication and therapy.

While diagnoses of mental disorders do not relieve Mr. Mairena of

12

responsibility for his crime, they do provide insight into the reasons for his commission of this crime, which Dr. Brooks noted "was completely contrary to his entire prior life history of lawful behavior." Dr. Brooks notes that Mr. Mairena experienced significant guilt as a result of his offense conduct and sought to relieve that guilt by bringing the situation to a head by revealing it. Dr. Brooks also points in particular to Mr. Mairena's problems with insight, self-esteem, self-destructiveness, grandiosity, affect and mood, and irrationality (elements of or behaviors resulting from his anxiety and obsessive-compulsive disorder), which hampered his judgment and lead to the offense in the first instance.

*Insight*. Mr. Mairena's lack of insight has been a challenge for him in recognizing why he behaved in this totally uncharacteristic manner. However, it also precludes him from recognizing his self-destructive tendencies and that by bifurcating his emotional feelings from his rational thought process, he unconsciously let his intense anger override his lifetime of values, beliefs and behavior. It is largely his inability to recognize this problem that leads Dr. Brooks to conclude that Mr. Mairena requires psychiatric treatment.

*Self-Esteem*. Mr. Mairena's poor self-esteem added to his struggle in the workplace where he felt devalued as a person and as a worker because of the caustic environment at FAH.[8] (Dr. Brooks' evaluation and report detail

---

[8] In raising these facts, the defense is not suggesting that Mr. Mairena's conduct was justified or that it was deserved by the victim. Rather, they are presented on the issues of Mr. Mairena's motivation

the factual basis for Mr. Mairena's perceptions in this regard.)

*Self-Destructiveness and Grandiosity*.    Dr. Brooks concludes that Mr. Mairena is somewhat driven to "invite suffering upon himself," a feeling which clearly drove his behavior here, where he knew from the start that he would probably be caught, but simultaneously was convinced that he would escape detection.

*Affect and Mood.*    According to Dr. Brooks, Mr. Mairena "does not readily reveal" and "does not appropriately deal with" his emotions.  This problem manifested itself here when he addressed his anger with his employer through a retaliatory embezzlement scheme, in part because he felt simply resigning would constitute a "failure" on his part.

*Irrationality.*    Dr. Brooks notes that, taken together, the problems listed above exhibit a high degree of irrationality.  Mr. Mairena's actions were contrary to his lifelong lawful behavior, and showed little awareness of the potential consequences to himself or his family.  He simultaneously knew that he would be caught and yet held to a belief that he would escape detection.

The issues identified by Dr. Brooks help to explain why Mr. Mairena acted as he did, and they demonstrate that, particularly with treatment, he is an unlikely candidate for recidivism.  Further, Dr. Brooks specifically notes that these problems

---

and character.  Mr. Mairena acknowledges that his conduct was completely unacceptable and undeserved by the victim.

do not make Mr. Mairena an "imminent danger to the community" and Mr. Mairena "could be safely incarcerated and treated in a minimal security environment."

### 3.    The Need to Make Restitution to the Victim

Mr. Mairena has already begun to make restitution to FAH.  Mr. Mairena provided undersigned counsel with a check for $70,000 on March 20, 2007, which cleared into counsel's escrow account on that date.  Counsel held these funds while awaiting instructions from FAH's counsel regarding certain logistics for conveying the restitution payment.  On April 10, 2007, a check in the amount of $70,000 was hand delivered by counsel to FAH's counsel, in partial payment of the restitution.

However, a significant amount of restitution remains to be paid. Mr. Mairena has indicated, from the time he first revealed his wrongdoing, that it was his intent to pay all necessary restitution to FAH.  As an educated professional, Mr. Mairena's skills should enable him to find employment that will allow him to continue to pay the restitution, although his conviction will obviously somewhat limit his employment opportunities.  The necessity of making significant restitution makes Section 3553(a)(7) a particularly import factor in this case.

### 4.    Other Purposes of Sentencing

There is no evidence that Mr. Mairena is dangerous or poses any significant risk of recidivism.  Research recently completed by the Sentencing Commission demonstrates that (i) recidivism rates decline relatively consistently as age

increases, from 35.5% under age 21, to 9.5% over age 50[9]; (ii) recidivism rates are lower for defendants who are or were ever married[10]; (iii) recidivism rates are lower for those without illicit drug use in the year prior to the offense[11]; and (iv) offenders sentenced under the fraud, larceny, and drug guidelines are the least likely to recidivate.[12]

We do not dispute that some period of confinement is appropriate to provide just punishment and deter others, given the nature of the offense. Mr. Mairena's psychiatric diagnosis also indicates that appropriate further treatment for his diagnosed mental conditions would be warranted. However, there is no need to provide Mr. Mairena with educational or vocational training, or other correctional treatment.

Accordingly, the issue in this case is to determine what terms and conditions of confinement are sufficient, but not greater than necessary, to achieve the purposes of sentencing.

5.    Consideration of the Advisory Guidelines

As discussed above, the Guidelines at offense level 15 call for a term of confinement in prison of 18-24 months. If the Court were to grant a two level downward departure for Mr. Mairena's voluntary disclosure and extraordinary acceptance of responsibility, as discussed above, the Guidelines level would come

---

[9] *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) (hereafter "Measuring Recidivism"), http://www.ussc.gov/publicat/Recidivism_General.pdf at 12 & Exh. 9.
[10] *Id.* at 12 & Exh. 10.
[11] *Id.* at 13 & Exh. 10.
[12] *Id.* at 13 & Exh. 11.

down to level 13, which calls for a 12-18 month range (in Zone D).

There are compelling reasons, however, to conclude that application of the Guidelines even at that level would produce an overly harsh sentence in this case – that is, one that is greater than necessary to achieve the purposes of sentencing, as required under Section 3553(a).   First, Congress directed the Sentencing Commission in 1984 to ensure that the "guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j).  The Commission recognizes the need to act on this directive, but has not yet done so.[13]  In 1991, a Commission working group proposed several alternatives to implement the congressional directive, including (1) a two-level reduction for offenders who had zero criminal history points and did not use violence or weapons in the instant offense; or (2) allowing first offenders access to probation or other alternatives to prison.[14]  In this case, a further two-level reduction for Mr. Mairena would drop his offense level to level 11 in Zone C, which would result in a range of 8 to14 months.  This would allow a split sentence of half prison and half community or home confinement.  U.S.S.G. § 5C1.1(d).

Furthermore, offenders are most likely to recidivate when their sentence is

---

[13] *Recidivism and the First Offender* (May 2004), http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf  at 1-2.
[14] *Id.* at 3.

straight prison, as opposed to probation of split sentences.[15]  In 1994, the General Accounting Office recommended intermediate sanctions for low-risk offenders at a lower cost to the taxpayers.[16]  And almost half of all district court judges surveyed in 2002 urged greater availability of non-prison sentences for theft, larceny, embezzlement, and fraud offenders in order to meet the purposes of sentencing set forth in § 3553(a)(2).[17]

6.    An Appropriate Sentence in this Case

The defense understands that the sentence in this case appropriately involves some period of confinement.   We respectfully submit, however, that confinement at a Federal Correctional Institution ("FCI") is unnecessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Instead, for the reasons set forth below, the defense submits that those purposes are best served by a sentence composed of:  (i) a "split sentence" of confinement in the range of 8-14 months, divided between a halfway house and home detention, (ii) an order of restitution, and (iii) an appropriate period of supervised release.  Determining the appropriate Guidelines level in this case to be Level 11, as described above, places the case in Zone C, which permits the use of community confinement or home detention to satisfy the "confinement" requirement.  U.S.S.G. § 5C1.1(c).

Other courts have not hesitated, after *Booker*, to impose similarly "split"

---

[15] *Measuring Recidivism* at 13 & Exh. 12.

[16] U.S. General Accounting Office, *Sentencing:  Intermediate Sanctions in the Federal Justice System* (1994).

[17] U.S. Sentencing Commission, Survey of Article III Judges on the Federal Sentencing Guidelines ES-5-6 (2003), http://www.ussc.gov/judsurv/execsum.pdf.

sentences in appropriate cases where the ends of sentencing are nevertheless served. For example, where a prison sentence of 18 months "would not result in significantly greater community protection", a split sentence that included nine months' home detention was deemed reasonable in *United States v. Anderson*, 365 F.Supp.2d 67, 69 (D. Me. 2005). A sentence that constitutes only a slight variation from the Guidelines, as long as it is still effective in addressing the purposes of sentencing, also does not create unwarranted disparity. *United States v. Devoy*, 2005 WL 1563337 (E.D. Wis. 2005). And, split sentences may be particularly appropriate in cases with first-time offenders, who - having never served any time with their liberty restricted before - are far more likely to be deterred simply by a split sentence in which some of their time is spent in a confinement setting. *See United States v. Givens*, 2006 WL 3390752 (D. Neb. 2006). Finally, home confinement that meets the purposes of punishment, deterrence, and respect for law can be an adequate substitute for imprisonment. *See United States v. Repp*, 2006 WL 3692463 (E.D. Wis. 2006).

In this case, we submit that a split sentence in the range of 8-14 months would be appropriate. We ask the Court to impose a term of confinement divided between a community corrections center and home confinement. There is no need in this case for a period of imprisonment at a FCI in order to sufficiently punish Mr. Mairena, promote respect for the law, and deter others. Indeed, were the Court to impose a sentence of 12 months split between a halfway house and home detention, Mr. Mairena would actually be required to serve more time (12 months)

19

in a confined setting than he would under a straight sentence of imprisonment for 14 months (which would result in only 11.9 months incarceration with the good conduct time credit he would receive). This sentence would vary only slightly from the guidelines and would not create any unwarranted disparity. It would also allow Mr. Mairena to regain employment in the short run and begin again to support his family and to repay the victim in this case. At present, Mr. Mairena has a prospective offer of employment that would be in his field of training to work for a friend who is aware of the instant offense and its nature. The employer is in the negotiation stage of a business venture that is not quite consummated. The defense anticipates that the prospective employer will be attending the sentencing hearing of this matter to address this issue and confirm that he is aware of the offense conduct.

In terms of the appropriateness of the sentencing in this case, the defense is aware that a related offender has already been sentenced in this matter, and of the sentence received by that offender. With respect to the issue of whether the sentence imposed on that offender and the one sought by the defense here are proportionate, the defense offers the following observations. First, the other offender was not a first-time offender as is Mr. Mairena, and in fact had a prior fraud type offense. Second, the amount of restitution that the offenders owe to the victim is very disparate, with Mr. Mairena owing a significantly higher amount. That factor militates in favor of a sentence for Mr. Mairena that would allow him to begin addressing the substantial amount of restitution that he individually owes.

Finally, while Mr. Mairena was prepared to come forward and disclose his misconduct, the other offender was not. In fact, after engaging undersigned counsel and determining to make the voluntary disclosure, Mr. Mairena revealed his intention to make the disclosure to the other offender, who tried unsuccessfully to dissuade Mr. Mairena from making the disclosure. For these reasons, the sentence requested here is appropriate and proportionate in this case.

Finally, the Court should impose a restitution order and an appropriate period of supervised release.

Respectfully submitted,


/s/ Leslie McAdoo
Leslie McAdoo
Leslie McAdoo, Chartered
1140 19th St. NW, Suite 602
Washington, DC 20036
Bar # 456781
(202) 293 0534 telephone
(202) 318-3005 facsimile

*Counsel for the Defendant*

21

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of April 2007, a copy of the foregoing

Defendant's Memorandum in Aid of Sentencing was served electronically to:

Virginia Cheatham
Assistant United States Attorney
555 4th St., NW
Washington, DC 20530

s/Leslie McAdoo

Leslie McAdoo

22



# *Sleepy Hollow United Methodist Church*

3435 SLEEPY HOLLOW ROAD
FALLS CHURCH, VA 22044

REV. PAMELA CLARK EGAN, Pastor
REV. JENNIFER AILSTOCK, Pastor
OFFICE: 703/534-6461
FAX: 703/532-4730
office@sleepyhollowumc.org

April 2, 2007

The Honorable John D. Bates
United States District Judge
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: U.S. v. Mairena, No. CR-06-349-01
Sentencing date: April 16, 2007

Dear Judge Bates:

I am writing this letter as character witness on behalf of Mr. Douglas D. Mairena. I am the pastor of Sleepy Hollow United Methodist Church in Falls Church, Va., and Mr. Mairena volunteers his time to serve as our Treasurer. Mr. Mairena divulged to me the fraud against his former employer on March 6, 2006. Our Finance Committee is aware of his legal situation and we decided to let him continue to serve in his role as Treasurer. Mr. Mairena's talents are greatly appreciated because the church has benefited immensely from them during the three years he has been our Treasurer.

I have gotten to know Mr. Mairena and his family personally over four years. He is a faithful husband, father, compassionate human being and a most loyal friend. It is quite unfortunate that he committed such a bad act because it in no way portrays the person I know and respect. As Mr. Mairena'a pastor, I've had many conversations with him about this matter and he has shown repentance and remorse for his reckless behavior and has taken responsibility and accountability for his actions.

Respectfully,

*Pamela Clark Egan*
Rev. Pamela Clark-Egan
Pastor

G. Stephen Reynolds
574 Mountain Slope Lane
Fort Valley, VA 22652


April 2, 2007



The Honorable John D. Bates
United States District Judge
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: U.S. v. Mairena, No. CR-06-349-01<br>Sentencing date: April 16, 2007

Dear Judge Bates:

I am writing on behalf of Mr. Douglas D. Mairena. I serve in the capacity of Finance Chair for Sleepy Hollow United Methodist Church in Falls Church, Va., and Mr. Mairena reports to me as the Treasurer. Mr. Mairena informed me and the Pastor of the fraud that he perpetrated against his former employer and the legal action he is enduring. His actions as our Treasurer have not put our church in any financial jeopardy. Conversely, we have the utmost faith in his accounting and finance abilities. It was through his hard work that our accounting records were automated. Prior to his taking the Treasurer's position the accounting of the church was done on ledger sheets and operated on a cash basis. Mr. Mairena continues to serve the church and the loss of his talents would be significant to the church. To replace his talents and abilities would be cost prohibitive to Sleepy Hollow United Methodist Church if we had to engage an outside accounting firm to perform his duties.

I have gotten to know Mr. Mairena over a year and half and he is a devoted husband and father. I believe the conduct for which he is before your Honor is completely out of his character. I've had many conversations with him about this matter and he has shown contrition and remorse for his reckless behavior and has taken responsibility and accountability for his actions.


Respectfully,

G. Stephen Reynolds
Finance Chair
Sleepy Hollow United Methodist Church



1776 Eye Street, N.W. • Washington, DC 20006

202.861.2265 • 202.861.3439 *Fax*

www.capitalbankmd.com



April 2, 2007

The Honorable John D. Bates
United States District Judge
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: U.S. v. Mairena, No. CR-06-349-01
Sentencing date: April 16, 2007

Dear Judge Bates:

Please accept this letter as character letter on behalf of Mr. Douglas D. Mairena. Mr. Mairena has informed me of his current legal situation and it is truly a shame that he committed such a crime because that is completely out of his character.

I have known Mr. Mairena both personally and professionally for the past twelve years. He has always conducted himself with the highest ethical and professional standards.   In my conversations with Mr. Mairena as it regards this matter, it is very clear to me he is remorseful for what he has done, and has taken full ownership of his actions.

Respectfully,

Reginald L. Johnson, Business Banker



FTI Consulting
1201 Eye Street. N.W.
Suite 400
Washington, DC 20005
202.312.9100 telephone
202.312.9101 facsimile
www.fticonsulting.com

## MEMORANDUM

TO:      **Jeff Micklos, Vice President and General Counsel**

FROM:    **FTI Consulting, Inc.**

DATE.    May 22, 2006

RE:      **Federation of American Hospitals Forensic Work**

We have been retained by Jeff Micklos, General Counsel of Federation of American Hospitals ("FAH"), to perform certain investigative procedures relating to an embezzlement that was believed to have been carried out at FAH by a former employee during fiscal years 2003 through 2005.

Summarized below are the procedures relating to the embezzlement investigation as performed to date by FTI Consulting, Inc. ("FTI"). In connection with our work, we inspected various relevant company and bank documents discussed those documents as necessary with company staff. Our investigation included an overview of certain forensic work performed by FAH's auditors, Councilor Buchanan and Mitchell ("Auditors").

Our procedures do not constitute an audit conducted in accordance with generally accepted audit standards. It is possible that additional information may be available that would alter our assessments as summarized in this memorandum. We reserve the right to revise, modify, amend and/or supplement any assessments or findings if and when additional information becomes available or is appropriate.

### Background Information

The embezzlement under investigation was originally believed to have been carried out by an FAH employee during the years 2003-2005. The fraud scheme in question appears to have involved the alteration of company checks and the deposit of FAH checks into the perpetrator's personal account. FAH became aware of a problem with their cash operating account when the former employee, Douglas Mairena, the former Controller of FAH, declared that he had misappropriated funds.

On March 15, 2006 FTI representatives Martin Wilczynski and Erin Nordmann met with Jeff Micklos and with Letitia Faison, Controller of FAH, in order to discuss the background of the

case facts and the initial procedures that would be performed to investigate and determine the
extent of the embezzlement.  At this meeting, we were informed that FAH had discovered that
in addition to Mairena, a second former employee, Mark Freeman was also believed to have
been involved.  Freeman was an administrative assistant to the CFO.  Our investigation
procedures accordingly covered both employees.

## Documents Reviewed

FTI requested a variety of documents during the course of the investigation, all of which were
made available to the extent that they were still available in FAH records.  The documents
included the following:

- Copies of FAH financial statements for the periods ended fiscal 2002 through 2004.
- Copy of the FAH budget prepared for 2005.
- Original or bank issued copies of all Wachovia bank statements and cancelled check
  copies for the period 2003 through 2005, including:
    o Main operating account
    o Payroll account
    o Deferred Comp Plan account
    o Cafeteria Section 125 plan
- Copies of all <u>available</u> FAH-prepared bank reconciliations for all FAH accounts for the
  period 2003 through 2005.
- Copies of all bank reconciliations provided by FAH to the Auditors in the course of
  audit work for 2004.
- Check Registers which identify all checks paid out of the FAH Main Operating account
  for the period 2003 through 2005.
- General Ledger report for the FAH bank accounts which identify all activity for the
  period 2003 through 2005.
- Copies of the annual 401(k) statements for the period 2003 through 2005.
- Copies of the quarterly 401(k) statements for Doug Mairena and Mark Freeman.
- Copies of any audit management / internal control letters received by FAH or its Board
  from the Auditors.
- Copy of the financial policies and procedures manual.

## Summary of Findings

Based on the procedures performed as described below, it is FTI's assessment that $328,960 in
FAH funds were inappropriately drawn and deposited into Mr. Mairena's personal account.  An
additional $30,997 in potentially inappropriate funds were drawn and deposited into Mr.
Mairena's personal account.  The propriety of these potentially inappropriate amounts could
not be verified with certainty due to a lack of underlying support.

It is also FTI's assessment that $48,069 in FAH funds were inappropriately drawn and
deposited into Mr. Freeman's personal account.  An additional $20,113 in potentially
inappropriate funds were drawn and deposited into Mr. Freeman's personal account.  The



Privileged and Confidential - Attorney Work Product
DRAFT

propriety of these potentially inappropriate amounts could not be verified with certainty due to a lack of underlying support.

A summary of these checks can be found on **Exhibit 1.**

## Procedures Performed

Each of the four bank accounts held by FAH was evaluated separately. These accounts include the Main Operating Account, Payroll Account, Deferred Comp Plans, and Cafeteria Section 125 Plan. Activity within the Company's 401(k) account was also evaluated.

### *Main Operating Account*

The Main Operating Account was evaluated in three separate steps, as detailed below:

- First, we inspected all checks that were distributed from the account to identify the checks that were potentially misappropriated.

- Second, we performed a bank reconciliation of the activity in the bank statements versus what was contained in the general ledger.

- Third, confirmations were sent to the largest customers of FAH to determine that their dues payments were properly reflected in the general ledger.

### *1. Analysis of Checks*

We compiled an electronic version of all checks cleared per the bank statements for the years 2003 through 2005, including check number, amount, and date cleared. This data was compared by check number to the electronic Check Registers provided by FAH, including check number, date written, payee, and amount. Based on this comparison, the following data was analyzed and checks identified for further review:

- The date cleared was compared to the date written to calculate the number of days outstanding. Any check with days outstanding calculated as zero or a negative value was selected for further review. Any checks with days outstanding calculated as one was reviewed if it was outside the normal pattern for that particular payee.

- All of the checks were sorted by payee and payment date. Any checks that did not follow the normal pattern for that particular payee or appeared to be recorded twice were identified for further review.

- The amount of the check that cleared the bank was compared to the amount per the Check Register. Any mismatches in amounts were identified for further review. Periodically when FAH was writing checks, a physical check was voided but it was not voided in the accounting system. This created a mismatch in the check numbers and



Privileged and Confidential - Attorney Work Product
DRAFT
3

amounts between the Check Register and the bank.  Once the check number mismatch was resolved and the amounts realigned, these checks were reviewed as normal.

- All checks with an amount recorded by the bank but reported as "missing" in the Check Register were selected for further review.  This often involved requesting the check copy from the bank since it was not recorded in the Check Register.

- All checks with the listed payee being Doug Mairena, Mark Freeman, or Petty Cash were identified for further review.  The supporting invoice packages were reviewed for these payees to determine the legitimacy of the payments; however, several of the files were missing from FAH files.[1]

- A summary of payments by payee was compiled for each of the three years 2003 through 2005 and reviewed by FAH management for validity of the payees (See **Exhibit 2**).  Any unusual or unfamiliar payees were identified and selected for further review.  Letitia Faison of FAH reviewed the supporting invoice packages for these payees and found no exceptions.

- Checks that were just under the amount of $2,000 (the threshold for needing two signatures on a check) <u>and</u> that fell outside the normal pattern for the particular payee were identified for further review.

- Checks for the same amount on or around the same date to two different payees were identified for further review.

- Five months were selected to review 100% of the checks written in that month to ensure that the payees on the checks matched what was recorded on the G/L.  In other words, each check was inspected to ensure that the payee had not been altered while keeping the amount the same in the G/L.  A paralegal hired by FAH reviewed the checks for June 2004, October 2004, May 2005, June 2005 and September 2005 and found no exceptions.

- The Vendor file from the Solomon reporting system was reviewed to see if there appeared to be any inappropriate vendors or vendors with addresses that went to either Doug Mairena or Mark Freeman's home address.

Once all of the applicable checks had been identified for further review, FTI reviewed the original check copy that had been returned with the bank statement.  If the original check was missing, a copy of the scanned image was requested from the bank.  A copy of the checks that were discovered to be misappropriated funds was retained by FTI (See Appendix 1).  The checks that were lacking support to determine if it was legitimate were classified as

---

[1] To the extent documentation could not be located, the underlying amounts were included as "potentially inappropriate" as described in the summary section of this report.



Privileged and Confidential - Attorney Work Product
DRAFT

"potentially fraudulent." The detail of this entire analysis is attached as **Exhibit 3** and the summary is attached as **Exhibit 1**.

*2. Bank Reconciliations*

Certain limited bank reconciliation procedures were performed for the 2003 through 2005 fiscal years. These procedures were targeted toward a comparison of the ledger and bank records in an attempt to identify differences. We reviewed, but did not reconstruct or audit bank reconciliations from throughout the timeframe in question. It is our understanding that those procedures were being performed by FAH and its auditors as part of the year end closing and auditing process.

The activity on each of the bank statements was compared to what was reflected in the general ledger cash account, including deposits, service fees, other debits, payroll, and sweep investment activity. The checks that were itemized in the Check Register were recorded by batch in the general ledger. In other words, the total of all checks disbursed in a single day were totaled and recorded within the general ledger as a single entry. Discrepancies between the bank statements and general ledger were identified and summarized by year for the periods 2003 through 2005 (See **Exhibit 4** for summary and **Exhibit 5** for detail).[2] A high level summary of the discrepancies noted is shown below, which could represent how a portion of the embezzlement was concealed:

| Category | 2003 | 2004 | 2005 |
|---|---|---|---|
| Bank Fees | ( 3,412.46) | ( 2,459.97) | ( 6,377.60) |
| Deposits | 4,013.40 | ( 72,380.34) | 66,841.03 |
| Other | (10,671.86) | ( 43,189.77) | 41.14 |
| Check Register Uploads | 135,558.16 | - | ** |
| Payroll | ( 821.32) | ( 19,679.66) | 168,789.33 |
| Total Difference to Bank* | 124,665.92 | (137,709.74) | 229,293.90 |

\*    Positive value represents potential required credit adjustment to G/L (i.e. cash balance may be too high). Negative value represents potential required debit adjustment to G/L (i.e. cash balance may be too low).

\*\*    Differences in the amount of $416,202.29 for amounts recorded into December 2005 activity in the G/L, but not recorded into the check registers until January 2006. As a reconciling item, this is not considered to represent a true "difference."

The payroll account used by FAH is a zero balance account ("ZBA") with the money being transferred from the operating account; therefore, the two were analyzed together when

---

[2] This summary does not include outstanding/ uncleared checks, since those are generally reconciling items in the bank reconciliations. For information purposes, our work disclosed that $3,815.29, $16,850.86 and $96,206.85 of checks recorded in 2003, 2004 and 2005, respectively were still outstanding as of December 31, 2005. Many of the 2005 checks cleared in the normal course in fiscal 2006.



performing the bank reconciliations. Due to timing differences of checks written out of the payroll account clearing the bank, the activity was not reconciled on a line by line basis to the General Ledger. A total difference for the entire year was calculated, as shown above.

FTI also obtained the year-end bank reconciliations that the Auditors had received from FAH for the year 2004 and determined that they agree with the information held in the FAH files.

*3. Confirmations*

FAH coordinated with the Auditors and FTI to test that the dues from largest customers of FAH were correctly recorded in the general ledger. Confirmations were sent to these customers and included blanks for the customer to fill in the amount and date paid for each quarter in 2004 and 2005. The returned confirmations were reviewed by FTI and the amounts were traced back to the general ledger to ensure that the amounts received were reflected appropriately. A summary of the amounts confirmed is presented below:

|  | 2004 | 2005 |
|---|---|---|
| Q1 | 1,551,695.00 | 1,587,281.25 |
| Q2 | 1,521,695.00 | 1,557,281.25 |
| Q3 | 1,521,695.00 | 1,576,031.25 |
| Q4 | 1,521,505.00 | 1,576,031.25 |
| Total | 6,116,590.00 | 6,296,625.00 |
| % of Annual Dues Revenue | 85% | 90% |

**Payroll Account**

The payroll account was reviewed in conjunction with the Main Operating Account as described above. Per Letitia Faison, all checks written out of this account are prepared by the third party payroll vendor. Check stock is not kept onsite at FAH. In addition, the 2005 Payroll file was reviewed by the Auditors for fictitious employees. No exceptions were noted.

**Deferred Comp Plans**

Each bank statement for the years 2003 through 2005 were reviewed for check and deposit activity. None of the activity appeared unusual.

**Cafeteria Section 125 Plan**

Each bank statement for the years 2003 through 2005 were reviewed for check and deposit activity. None of the activity appeared unusual.

**401(k) Plan**

The activity in the FAH 401(k) plan was evaluated on an annual basis to determine that the distributions were valid and for employees of FAH. All of the activity within Doug Mairena



Privileged and Confidential - Attorney Work Product
DRAFT
6

and Mark Freeman's 401(k) accounts was evaluated on a quarterly basis to determine that it was appropriate. None of the activity appeared unusual.

# WACHOVIA

February 24, 2006 03:28:20 PM

Fax Number: 812027377317

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON DC 20004

RE:  Account Number: ~~XXXXXXXXXXXXXXX~~
     Request Number: 00001296050000000000
     Number of pages, including cover: 7

Dear Customer:

Thank you for allowing us to assist you by providing our research photocopy service. We have enclosed the information you requested on the account referenced above. If you have any questions specific to the enclosed information, please call us at 800-Wachovia (922-4684), where we are available to assist you 24 hours a day, 7 days a week.

Again, thank you for your business. We appreciate this opportunity to serve you.

Sincerely,

Synthia Meggett
Wachovia Bank

++++++++++ +++ ++++++++ ++ +++++++++ ++++ ++++++++++ +++++++ ++++++++++ ++++++ ++++++++++ ++++++++++
This fax message contains confidential information intended only for the use of the individual or entity named above as the recipient. If you are not this intended recipient or are not responsible for delivering it to the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this telecopy or the information herein is strictly prohibited. If you have received this telecopy in error, please notify the sender at the number listed above. Thank you.
+++++++ +++++++++++++++++++++++++++++++++ +++++++++++++++++++++++++++++++++++++++++++++++++++++

Apr-11-2007 04:26pm From-                                    T-468  P.002   F-072

Case 1:06-cr-00349-JDB    Document 13-6    Filed 04/12/2007    Page 2 of 10
REDE:00001296050000000000:1002 scanned on by Operator ArcImpMgr on Feb 24, 2006 at 03:29:09 PM - Page 3 of 7.

Federation of
American
Hospitals

801 Pennsylvania Ave. NW
Suite 245
Washington, DC 20004-2604

WACHOVIA
Wachovia Bank, N.A.
www.wachovia.com

114143

53-122/540

8/23/2005    114143    ****2000.00

Two Thousand and 00/100*********************************************************

PAY
TO THE
ORDER
OF:

Douglas. D. Mairena
3105 Collie Lane
Falls Church, VA 22044

TWO SIGNATURES REQUIRED IN EXCESS OF $2,000.00

Susan Van Feelen

AUTHORIZED SIGNATURE

⑆114143⑆ ⑆053000219⑆ 2030000011911⑆    /0000 200000/

X0312007304
WACHOVIA NA SWOO13 87877
PHILA, PA 9122805 677K
7410992745

REQUEST 00001296050000000 2000.00
ROLL ECIA   20050824  000007410992745
JOB ECIA  F  ACCT 0522030000119118
REQUESTOR Synthia Maggett

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON DC 20004

FROM FIRST UNION          TO                    2/24/2006 6:06 PM Page 3



REQUEST 00001296050000000 2000.00
ROLL ECIA 20050824 000007410992744
JOB ECIA F ACCT 0522030000119118
REQUESTOR Synthia Meggett

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON DC 20004

| | | | | 114145 |
|---|---|---|---|---|
| Federation of American Hospitals | 801 Pennsylvania Ave. NW Suite 245 Washington, DC 20004-2604 | | WACHOVIA Wachovia Bank, N.A. www.wachovia.com 15-122/540 | |
| | | 8/23/2005 | 114145 | ****2000.00 |

Two Thousand and 00/100************************************************************

PAY TO THE ORDER OF: Douglas D. Mairena
3105 Collie Lane
Falls Church, VA 22044

TWO SIGNATURES REQUIRED IN EXCESS OF $2,000.00

*Susan Van Bealin*

AUTHORIZED SIGNATURE

⑈114145⑈ ⑆054005240⑆ ⑈0000 200000⑈

743120073304
WACHOVIA DA SMOATH 07837
PHILA, PA 08232006 07PK
7410992746

Douglas D. W—
for Deposit Only
Acct # 01050452406

REQUEST 00001296050000000 2000.00
ROLL BCIA   20050824 000007410992746
JOB BCIA F ACCT 0522030000119118
REQUESTOR Synthia Meggett

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON DC 20004

FROM FIRST UNION          TO                    2/24/2006 6:06 PM Page 4



114146

Two Thousand and 00/100***************************************************

PAY
TO THE
ORDER
OF

Douglas D. Mairena
3105 Collie Lane
Falls Church, VA 22044

8/23/2005    114146    *****2,000.00

TWO SIGNATURES REQUIRED IN EXCESS OF $2,000.00

AUTHORIZED SIGNATURE S.

7410896675

REQUEST 00001296050000000 2000.00
ROLL ECIA   20050824 000007410896675
JOB ECIA F  ACCT 0522030000119118
REQUESTOR Synthia Meggett

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON DC 20004

FROM FIRST UNION          TO          2/24/2006 6:06 PM Page 5

KEDE.00001296050000000000.1000 scanned on... by Operator Archimpager on Feb 24, 2006 at 03.29.10 PM • Page 6 of 7...

Federation of      801 Pennsylvania Ave. NW
American           Suite 245
Hospitals          Washington, DC 20004-2604

WACHOVIA                                   114147
Wachovia Bank, N.A.
www.wachovia.com
16-123/640

8/23/2005     114147      ***2,000.00

Two Thousand and 00/100*********************************************************************

PAY
TO THE      Douglas D. Mairena
ORDER       3105 Collis Lane
OF:         Falls Church, VA 22044

TWO SIGNATURES REQUIRED IN EXCESS OF $2,000.00

Susan Van Harlem

AUTHORIZED SIGNATURE(S)

⑈114147⑈  ⑆⑄⑆⑆⑆⑆⑆⑆⑆⑆⑈  ⑆0000200000⑆

⑈0312007304⑈
WACHOVIA PA SHORT 87TXT
PHILA PA 0022003 87TX
7410896676

[handwritten endorsement] Douglas D. M—
For Deposit Only
Acct # 01050452008

REQUEST 00001296050000000 2000.00
ROLL BCIA  20050824 000007410896676
JOB BCIA  F  ACCT 0522030000119118
REQUESTOR Synthia Meggett

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON· DC 20004

FROM FIRST UNION          TO              2/24/2006 6:06 PM  Page 6

REDE:0000129605000000000000:1006 scanned on by Operator ArcimpMgr on Feb 24, 2006 at 03:29:20 PM - Page 7 of 7.

| | | 114148 |
|---|---|---|
| Federation of American Hospitals   801 Pennsylvania Ave. NW   Suite 245   Washington, DC 20004-2604 | WACHOVIA   Wachovia Bank, N.A.   www.wachovia.com   15-122/540 | |

8/23/2005    114148    ****2,000.00

Two Thousand and 00/100***********************************************************************

PAY
TO THE
ORDER
OF

Douglas D. Mairena
3105 Collie Lane
Falls Church, VA 22044

TWO SIGNATURES REQUIRED IN EXCESS OF 2,000.00

_Susan Van Beek_

AUTHORIZED SIGNATURE

⑈114148⑈ ⑈054001220⑈0520500011ⓥ118⑈ /0000 200000/

I·0312007304
WACHOVIA VA SVC071 0770T
PHILA. PA 08262005 0770K
7410896677

[handwritten annotations:]
Douglas D.M.
Dr. Deposit Only
Acct # 0522032046

REQUEST 00001296050000000 2000.00
ROLL ECIA   20050824   000007410896677
JOB ECIA   F   ACCT 0522030000119118
REQUESTOR Synthia Meggett

FEDERATION OF AMERICAN HOSPITALS
801 PENNSYLVANIA AVE NW
SUITE 245
WASHINGTON DC 20004

FROM FIRST UNION     TO       2/24/2006 6:06 PM Page 7

02-24-2006 04:15pm From-WACHOVIA  2024143465  T-017 P.002/004 F-625

114198

Federation of
American
Hospitals
601 Pennsylvania Ave, NW
Suite 500
Washington, DC 20004-2601

W.A.C. BANK, N.A.
Wachovia Bank, N.A.
16-122/540

4/27/2005    114198    ******2,000.00

Two Thousand and 00/100***************************************************************

Pay
to the
order
of
Douglas D. Mairena
3105 Collie Lane
Falls Church, VA 22044

TWO SIGNATURES REQUIRED IN EXCESS OF $1,000.00

Susan Van Beelen

⑈114198⑈ ⑆054⑈⑈⑈⑈⑈⑈40⑈0⑈⑈⑈⑈⑈⑈⑈⑈⑈⑈⑈⑈ ⑆0000200000⑆

[handwritten: Donald D N ___ for Deposit only for N° 0100543966]

[stamp, reversed: 0910000114 WACHOVIA NA 35120 24671 FALLS, VA 0100043 MTR 4810643060 4510043969]

| Account | Date | Amount | Serial Number | Sequence | Status |
|---|---|---|---|---|---|
| 00000203000011811B | 20050426 | $2,000.00 | 0000000011419B | 00000000004810643969 | Posted Item |

Wachovia National Bank certifies that the above image is a true and exact copy of
the original item issued by the named customer, and was produced from original
data stored in the archives of Wachovia National Bank or its predecessors.

FROM 2024143465    TO    2/24/2006 4:15 PM Page 2

02-24-2006 04:15pm From-WACHOVIA
2024143465
T-017 P.004/004 F-625

WACHOVIA
Wachovia Bank, N.A.
www.wachovia.com

114143

8/23/2005   114143   *****2000.00

Two Thousand and 00/100************************************************************

Federation of
American
Hospitals
801 Pennsylvania Ave, NW
Suite 245
Washington, DC 20004-2604

PAY
TO THE
ORDER
OF:
Douglas D. Mairena
3105 Collie Lane
Falls Church, VA 22044

TWO SIGNATURES REQUIRED IN EXCESS OF $2,000.00

_Susan Van Gelder_

AUTHORIZED SIGNATURE

⑈114143⑈ ◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼ ⑈0000 200000⑈

bought DMc—
For Detroit CME
Acct #0 D1205145246

7410592745

| Account | Date | Amount | Serial Number | Sequence | Status |
|---|---|---|---|---|---|
| 00000200000011911B | 20050824 | $2,000.00 | 000000000114143 | 00000000007410592745 | Posted Items |

Wachovia National Bank certifies that the above image is a true and exact copy of
the original item issued by the named customer, and was produced from original
data stored in the archives of Wachovia National Bank or its predecessors.



Wachovia National Bank certifies that the above image is a true and exact copy of
the original item issued by the named customer, and was produced from original
data stored in the archives of Wachovia National Bank or its predecessors.

| Account | Date | Amount | Serial Number | Sequence | Status |
|---|---|---|---|---|---|
| 00000209000119113 | 20051019 | $1,950.00 | 0000000114890 | 000000001017631245 | Posted Items |

# Sidney C. Brooks, M.D.

**DBA "PFPSS"**
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 1-866-835-3129 ~ Fax 1-866-852-3129
scbrooksmd@aol.com

## MEDICAL LICENSURES

| | | |
|---|---|---|
| 1972 | Commonwealth of Virginia | 22880 |
| 1975 | State of Maryland | D17852 |
| 1978 | District of Columbia | 11335 |

## DIPLOMATE CERTIFICATES

| | |
|---|---|
| 1965 | Bachelor of Arts, Albion College, Albion, MI |
| 1971 | Doctor of Medicine, University of Michigan Medical School, Ann Arbor, MI |
| 1974 | Certificate of Residency in Psychiatry, Lafayette Clinic, Detroit, MI |
| 1978 | Diplomate, National Board of Medical Examiners |
| 1978 | Diplomate in Psychiatry, The American Board of Psychiatry and Neurology |
| 1991 | Diplomate, The American Board of Professional Disability Consultants |
| 1996 | Diplomate, The American Board of Forensic Medicine |
| 1996 | Diplomate, The American Board of Forensic Examiners |
| 1996 | Diplomate, The American Board of Experts in Traumatic Stress |

## ACADEMIES AND COLLEGES

| | |
|---|---|
| 1980 | New York Academy of Sciences |
| 1996 | American College of Forensic Examiners |
| 1996 | American College of Forensic Medicine |
| 1996 | American Academy of Experts in Traumatic Stress |
| 1996 | American Academy of Psychiatry and Law (Past) |

## SOCIETIES AND ASSOCIATIONS

| | |
|---|---|
| 1975 | American Psychiatric Association (Past) |
| 1975 | Washington Psychiatric Society (Past) |
| 1982 | Society of Biological Psychiatry |
| 1991 | Who's Who in Science and Engineering |
| 1997 | Medical Society of The District of Columbia (Past) |

## ACADEMIC HONORS

### Albion College

| | |
|---|---|
| 1961-1965 | Dean's List |
| 1961-1965 | Honor's Chemistry |
| 1961-1965 | Highest Academic Final Exam and Course Grade Point, Zoology, Biological Evolution, Organic Chemistry, Calculus and Analytic Geometry, Advanced English Composition, Ethics, Chemical Quantitative Analysis |
| 1964 | Member, Albion College Team MIAA Academic Bowl Competition |
| 1964-1965 | Beta Beta Beta Biological Honor Society |
| 1964-1965 | Honors Philosophy |
| 1964-1965 | Independent Research in Advanced Chemistry |

### University of Michigan Medical School

| | |
|---|---|
| 1967 | National Medical Aptitude Test. 99th Percentile Sciences, 97th Percentile Mathematics, 97th Percentile Accumulative Average |
| 1968 | Pediatrics Course Grade 'A Plus' |
| 1969 | Neurosurgery Course Grade 'A Plus' |
| 1970 | Psychiatry Course Grade 'A' |
| 1970 | Victor Vaughan Society Intellectual Honorary |

# Sidney C. Brooks, M.D.

**DBA "PFPSS"**
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 1-866-835-3129 ~ Fax 1-866-852-3129
scbrooksmd@aol.com

## GRANTS AND SCHOLARSHIPS

| | |
|---|---|
| 1961-1965 | Albion College Scholarship |
| 1961-1965 | Gerber Products Company College Scholarship |
| 1965-1967 | Gerber Products Company Research Grant |
| 1966-1967 | Michigan Cancer Society Research Grant |

## ADMINISTRATIVE, ACADEMIC, AND CLINICAL POSITIONS

Albion College

| | |
|---|---|
| 1963-1964 | Resident Advisor Dean of Men's Staff |
| 1964-1965 | Resident Director Dean of Men's Staff |

Gerber Products Company

| | |
|---|---|
| 1964-1965 | Senior Research Technician, Gerber Research Institute |

Parke-Davis Pharmaceutical Company

| | |
|---|---|
| 1965 | Medical Writer |

University of Michigan Medical School

| | |
|---|---|
| 1966 | Associate in Research, Department of Internal Medicine |

Lafayette Clinic and Wayne State University Medical School

| | |
|---|---|
| 1973-1974 | Instructor in Psychiatry |
| 1974 | Chief Resident in Psychiatry |
| 1974 | Administrator Research Ward |

United States Public Health Service

| | |
|---|---|
| 1973-1974 | Consultant in Psychiatry |

Detroit Police Department

| | |
|---|---|
| 1974-1975 | Consultant in Psychiatry |

Arlington Hospital

| | |
|---|---|
| 1975-1976 | Medical Liaison Psychiatrist |
| 1976-1978 | Chairman, Department of Psychiatry and, |
| 1976-1979 | Medical Director, Department of Psychiatry, Arlington Virginia |

United States Government

| | |
|---|---|
| 1975-1983 | Consultant in Psychiatry, National Security Agencies: CIA, FBI, DOD, NSA, The Presidency. |

Allied Health Services

| | |
|---|---|
| 1984-1985 | Medical Director, Dual Diagnosis, and Substance Abuse Programs |
| 1984-1985 | Consultant in Laboratory Psychobiology, Detroit, Michigan |

Healthcare Services of America

| | |
|---|---|
| 1986-1987 | Medical Director, Riverside Mental Health Clinic |
| 1986-1987 | Clinical Director of Forensic Services, Hillcrest Sunrise Hospital and Mental Health Clinics, Birmingham, Alabama |

## Sidney C. Brooks, M.D.
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 1-866-835-3129 ~ Fax 1-866-852-3129
scbrooksmd@aol.com

## ADMINISTRATIVE, ACADEMIC, AND CLINICAL POSITIONS (CONTINUED)

Hospital Corporation of America

| | |
|---|---|
| 1987-1988 | Medical Director of Behavioral Medicine, Department of Internal Medicine, HCA Midway Park Hospital, Dallas, Texas |
| 1987-1988 | Consultant in Laboratory Psychobiology, Allied Clinical Laboratories, Hurst, Texas |
| 1989-1994 | Staff Psychiatrist and Member Psychiatry Department Development Committee, Presbyterian Hospital of Dallas Texas |

Psychiatric Institutes of America

| | |
|---|---|
| 1990 | Medical Director of Clinical Neuroscience, Willowbrook Hospital, Waxahachie Texas |

Baylor Healthcare System

| | |
|---|---|
| 1990-1992 | Medical Director of Mental Health Services and Behavioral Medicine, Baylor Medical Center at Garland, Garland, Texas |

District of Columbia Mental Health Commission

| | |
|---|---|
| 1997-1998 | Medical Officer Pre-Trial and Post-Trial Programs, John Howard Pavilion Acting Medical Director, Forensic Services Division, St. Elizabeth's Hospital, Washington, D.C. |
| 1997-1998 | Member, Teaching Faculty, St. Elizabeth Hospital Forensic Services Division, Washington, D.C. |

Professional Forensic Psychiatric Science Services, Inc. Alexandria, Virginia

| | |
|---|---|
| 1995-2006 | President and CEO |
| 1995-1996 | Forensic Psychiatric Consultant for Army and Air Force Exchange Services and for United States District Attorneys |
| 1999-2000 | Child, Adolescent, and Adult Clinical and Forensic Staff Psychiatrist, Cornerstone Healthcare Systems, Annapolis, Maryland |
| 2000-2001 | Child, Adolescent, and Adult Clinical and Forensic Staff Psychiatrist for Omni Healthcare Systems, Glen Burnie, Maryland |
| 2000-2001 | Deputy Medical Director, Adolescent and Adult Dual Diagnosis and Substance Abuse Programs, Omni Healthcare Systems, Glen Burnie, Maryland |
| 2001-2002 | Forensic Psychiatrist, Fairfax-Falls Church Community Services Board, Fairfax County, Adult Detention Center, Fairfax, Virginia |
| 2001 | Volunteer Psychiatrist, Pentagon Disaster Red Cross Relief Services |
| 2002 | Forensic Psychiatrist, U.S. Pre-Trial Programs United States District Court Eastern District of Virginia |

## Sidney C. Brooks, M.D.

DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 1-866-835-3129 ~ Fax 1-866-852-3129
scbrooksmd@aol.com

## ADMINISTRATIVE, ACADEMIC, AND CLINICAL POSITIONS (CONTINUED)

| | |
|---|---|
| 2002-2003 | Psychiatric Consultant, Phoenix Center Drug and Alcohol Programs, Edgwood, Maryland |
| 2003 | Psychiatrist, Correctional Medical Services, Arlington County Adult Detention Center, Arlington, Virginia |
| 2004 | Chief Psychiatrist, Center for Correctional and Health Policy Studies, The District of Columbia Department of Corrections, Adult Detention Center and Adult Treatment Center, Washington, D.C. |
| 2005 | Consulting Psychiatrist, State of Maryland Department of Mental Health and Mental Hygiene/ Department of Corrections |
| 2006 | Staff Psychiatrist, State of Maryland Department of Mental Health and Mental Hygiene/ Forensic Services. |

## RESEARCH PROJECTS

| | |
|---|---|
| 1964-65 | Analysis of Folic Acid in Baby Food, Senior Research Technician, Gerber Products Company Research Center, Fremont, Michigan |
| 1966-67 | In Vivo Human Intestinal Glucose Transport Studies in Malabsorption (non-tropical sprue), Research Technician, Clinical Research Unit, University of Michigan Medical School, Ann Arbor, Michigan |
| 1967-68 | Folic Acid Studies in Anemia, Lymphomas, Leukemia's, in-vivo Human Blood-Brain Barrier-CSF Folate Pharmacokinetics; Folate Malabsorption, and Folate Analytic Methodology; Associate in Research, Department of Internal Medicine, Simpson Memorial Institute for Hematological Research, University of Michigan Medical School, Ann Arbor, Michigan |
| 1968 | Gamma-butyrolactone Effect Upon Rat Brain Dopamine Levels, Mental Health Research Institute, University of Michigan Medical School, Ann Arbor, Michigan |
| 1975 | FDA IND 12241 Methyl-tetrahydrofolic Acid in Schizophrenia, The Arlington Hospital, Arlington, Virginia |
| 1976 | FDA Individual Case Approved Study, L-trytophan and L-tyrosine Precursor Therapy in a Treatment Refractory Case of Atypical Psychosis and Affective Disorder, The Arlington Hospital, Arlington, Virginia |
| 1982 | FDA IND 1968, L-tyrosine and L-tryptophan Therapy in a Case Study of Atypical Psychosis Borderline Syndrome, and Depression, in collaboration with S. Charles Schulz, M.D. Medical College of Virginia and The Arlington Hospital, Richmond, Virginia and Arlington, Virginia |

4

## Sidney C. Brooks, M.D.
### DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 1-866-835-3129 ~ Fax 1-866-852-3129
scbrooksmd@aol.com

## PUBLICATIONS

### Restricted Gerber Products Company Publications
1964    Folic Acid: Nutrition and Assay Methodology
1964    Folic Acid: A Review
1965    Vitamin K in Infant Nutrition
1966    Carbohydrates in Infant Nutrition
1966    Nitrate-Nitrite Nitrogen and Infantile Methemoglobinemia

### Unrestricted Publications

Brooks, S.C., Linn, J.J., and Disney, N.-"Serotonin, Folic Acid and Uric Acid, Metabolism in the Diagnosis of Neuropsychiatric Disorders," Biological Psychiatry 13,6:671-664(1978)

Brooks, S.C., and Lessin, B.E.,"Treatment of Resistant Lithium-Induced Nephrogenic Diabetes Insipidus and Schizoaffective Psychosis with Carbamazepine," American Journal of Psychiatry 140, 8:1077-1078(1983)

Brooks, S.C., D'Angelo, L., Chalmeta, A., Ahern, G., and Judson, J.H. "An Unusual Schizophrenic Illness Responsive to Pyridoxine HCL (B6) Subsequent to Phenothiazine and Butyrophenone Toxicity's, Biological Psychiatry 18, 11:1321-1328 (1983)

Brooks, S.C., "Bimolecular Information Analysis in Neurotransmitter Systems," Acta Biotheoretica 33, 1:3-33 (1984)

Brooks, S.C., "Mental Competency: An Evolving Concept in Medicine, Psychiatry Psychology and Law." The Forensic Examiner (Authorship in Process)

Brooks, S.C., "Multifactorial Consideration in the Assessment of Suicide Risk," The Forensic Examiner (Authorship in Process).

Brooks, S.C., "Multifactorial Considerations in the Assessment of Homicidal Risk," The Forensic Examiner (Authorship in Process)

# Sidney C. Brooks, M.D.

**DBA "PFPSS"**
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 1-866-835-3129 ~ Fax 1-866-852-3129
scbrooksmd@aol.com

## APPEARANCES AND PRESENTATIONS

Appearances

| | |
|---|---|
| 1987 | "Dangerous Games" Series<br>ABC Television "Entertainment Tonight Show" with Geraldo Rivera, Dallas, Texas |

Presentations

| | |
|---|---|
| 1976 | "Depression Symposium"<br>Northern Virginia Mental Health Association, Arlington, Virginia |
| 1976-77 | "Continuing Lecture Series in Psychiatry"<br>The Arlington Hospital, Arlington, Virginia, and the University of Virginia, Charlottesville, Virginia. |
| 1986 | "Psychiatry and the Law"<br>The Birmingham Chapter of the Alabama State Bar Association with Andrew Watson, M.D., Professor of Psychiatry and Law, The University of Michigan Medical School, and The Hillcrest Sunrise Hospital, Birmingham, Alabama. |
| 1987 | "Continuing Lecture Series in Psychiatry and Behavioral Medicine"<br>HCA Midway Park Medical Center, Dallas, Texas |
| 1988 | "Case Studies in Behavioral Medicine"<br>HCA Midway Park Medical Center, Dallas, Texas |
| 1990-91 | "Continuing Lecture Series in Psychiatry and Behavioral Medicine"<br>Baylor Medical Center of Garland, Garland, Texas |
| 1991 | "The Decade of the Brain"<br>Baylor Medical Center of Garland, Garland, Texas |

## AWARDS

| | |
|---|---|
| 1965 | Omicron Delta Kappa Men's National Leadership Society |
| 1965 | Who's Who in American Colleges and Universities |
| 1965 | Chairman, Campus Relations Board of Albion College |
| 2000 | Armijo Clinical Appreciation Award, Cornerstone Health Care Systems |
| 2001 | Donald Rumsfeld Department of Defense Certificate of Recognition for Service in the 911 Pentagon Disaster |
| 2004 | Who's Who in America |
| 2006 | "America's Top Psychiatrists"<br>Consumers Research Council of America |

## REFERENCES
References available upon request

**Sidney C. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

APRIL 4, 2007

MS. LESLIE MCADOO, CHARTERED
ATTORNEY AT LAW
1140 19TH STREET, N.W.
            SUITE 602
WASHINGTON, D.C. 20036
202.293.0534
FAX 202.318.3005

### RE: DOUGLAS MAIRENA

DEAR MS. MCADOO:

PLEASE FIND HEREWITH ATTACHED THE INITIAL 'FORENSIC PSYCHIATRIC
EXAMINATION' OF MR. DOUGLAS MAIRENA CONDUCTED ON 02.22.06, AND
INCORPORATED HEREWITH AND HEREIN AND ATTACHED HERETO AS
'EXHIBIT A'. THIS EXAMINATION WAS REQUESTED AT YOUR REQUEST AND
WITH THE AGREEMENT OF MR. MAIRENA AND AS CONCERNS THE MATTER
BEFORE THE COURT AND HIS VOLUNTARY ADMISSION TO THE COMMISSION
OF A CRIME AGAINST HIS FORMER EMPLOYER AND WHICH ALSO CONCERNS
THE PLEA BARGAIN AGREEMENT PROCESS WHICH HAS CONSEQUENTLY
DEVELOPED PURSUANT TO MR. MAIRENA'S EARLIER VOLUNTARY ADMISSION
OF HIS CRIME. MR. MAIRENA WAS SEEN IN FOLLOW-UP TO THE INITIAL
FORENSIC PSYCHIATRIC EXAMINATION ON THE SUBSEQUENT DATES OF
03.22.07 AND 04.06.07 FOR THE PURPOSE OF OBTAINING A FINAL 'SUMMARY
FORENSIC PSYCHIATRIC OPINION' IN THIS MATTER WHICH IS RELATED AND
DELINEATED HEREIN BELOW AND WHICH IS TO BE SUBMITTED, AS I
UNDERSTAND IT, TO THE COURT AND PROSECUTOR FOR CONSIDERATION IN
THE SENTENCING PROCESS OF MR. MAIRENA IN HEARING PRESENTLY
SCHEDULED AND SET FOR 04.16.07 IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA.

1

**Sidney C. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

THE SOURCES CONSIDERED IN DEVELOPING THIS FINAL 'SUMMARY FORENSIC PSYCHIATRIC OPINION' ARE AS FOLLOWS:

1. TELEPHONIC CONFERENCE WITH LESLIE MCADOO 02.20.06;

2. 'FORENSIC PSYCHIATRIC EXAMINATION' OF MR. DOUGLAS MAIRENA (HEREWITH ATTACHED AS 'EXHIBIT A') 02.22.06;

3. TELEPHONIC CONFERENCE WITH PSYCHIATRIC CONSULTANT STEVEN LIPSIUS, M.D. 03.01.06;

4. TELEPHONIC CONFERENCE WITH PSYCHIATRIC CONSULTANT ANDREW MOLCHON, M.D. 03.17.07;

5. TELEPHONIC CONFERENCE WITH LESLIE MCADOO 02.23.07;

6. PROBATION REPORT CONCERNING MR. DOUGLAS MAIRENA PREPARED BY SHERRY BRANDON, UNITED STATES PROBATION OFFICER FOR JOHN D. BATES, UNITED STATES DISTRICT JUDGE 03.01.07;

7. FOLLOW-UP EXAMINATION OF MR. DOUGLAS MAIRENA 03.16.07;

8. TELEPHONIC CONFERENCE WITH LESLIE MCADOO 03.30.07;

9. FOLLOW-UP EXAMINATION OF MR. DOUGLAS MAIRENA 04.02.07;

10. MEETING WITH MR. BARRY D. COLVERT, FORENSIC POLYGRAPHER AND CONSULTANT, AND WITH MS. LESLIE MCADOO, AND WITH MR. DOUGLAS MAIRENA 04.02.07;

DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

11. TELEPHONIC CONSULTATION WITH LESLIE MCADOO 04.03.07.

## SUMMARY PSYCHIATRIC FORENSIC OPINION

### CASE HISTORY

MR. DOUGLAS MAIRENA IS A 40 YEAR OLD MARRIED MALE OF HISPANIC DESCENT WITH BIRTHDATE OF 10.25.66. HE WAS BORN IN NICARAUGA, EMIGRATED TO THE UNITED STATES WITH HIS NUCLEAR FAMILY IN 1972, AND BECAME A NATURALIZED AMERICAN CITIZEN IN 1987. HE IS MARRIED TO A WIFE THREE YEARS HIS ELDER WHO IS AN EMPLOYED CPA. THEY HAVE BEEN MARRIED FOR 13 YEARS AND HAVE BEGAT TWO FEMALE CHILDREN AGES 11 YEARS AND 9 YEARS OF AGE. MR. MAIRENA AND HIS FAMILY RESIDE IN FALLS CHURCH, VIRGINIA. MR. MAIRENA HAS BEEN HISTORICALLY EMPLOYED AS A FINANCE COMPTROLLER WITH SEVERAL COMPANIES IN ASSOCIATION WITH HIS RECEIVING A BS DEGREE IN ACCOUNTING FROM STRAYER UNIVERSITY IN 1999 AND AN MBA DEGREE FROM JOHNS HOPKINS UNIVERSITY IN 2003. HE GRADUATED FROM JEB STEWART HIGH SCHOOL IN FALLS CHURCH, VIRGINIA IN 1985. MR. MAIRENA SERVED IN THE U.S. ARMY NATIONAL GUARD FROM 1985 - 1988, FROM WHICH SERVICE HE WAS DISCHARGED HONORABLY DUE TO MEDICAL REASONS (LUMBAR HERNIATED DISC). MR. MAIRENA INDICATES HE IS OF METHODIST PROTESTANT AFFILIATION AND HAS SERVED AS THE TREASURER OF HIS LOCAL CHURCH.

**Sidney C. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

UP UNTIL THE ADMISSION OF HIS INSTANT OFFENSE, AND HIS VOLUNTARY DISCLOSURE THEREOF, MR. MAIRENA DENIES THAT HE WAS EVER THE SUBJECT OF ANY DISCIPLINARY ACTION IN THE COURSE OF HIS EDUCATION, EMPLOYMENT(S), AND / OR MILITARY SERVICE. THE RECORD INDICATES THAT HE HAD NO CRIMINAL HISTORY WHATSOEVER IN THE COURSE OF HIS LIFETIME, PRIOR TO THE INSTANT OFFENSE. PRIOR TO THE DISCLOSURE OF HIS INSTANT OFFENSE HE HAD BECOME A SUCCESSFUL AND RESPECTED MEMBER OF HIS CHURCH AND HIS COMMUNITY.

MR. MAIRENA BECAME EMPLOYED BY THE *FEDERATION OF AMERICAN HOSPITALS* AND SUSTAINED EMPLOYMENT WITH THEM FROM JUNE OF 2001 UNTIL NOVEMBER OF 2005, AT WHICH TIME HE RESIGNED. DURING THE COURSE OF THIS EMPLOYMENT, ADMITTEDLY, HE DIVERTED COMPANY FUNDS TO HIS PRIVATE ACCOUNTS IN A CONTINUING MANNER BY CREATING DUPLICATE COMPANY CHECKS FOR THE SAME EXPENSE AND BY ALTERING THE DUPLICATE CHECK AFTER IT HAD BEEN SIGNED BY THE COMPANY FINANCIAL OFFICER. HE ADMITTEDLY ENGAGED IN THIS BEHAVIOR FROM THE SUMMER OF 2003 UNTIL THE FALL OF 2005, AT WHICH TIME HE RESIGNED. IN THE COURSE OF THE COMMISSION OF HIS CRIMINAL BEHAVIOR AGAINST HIS EMPLOYER, HIS CONDUCT BECAME DETECTED BY THE EXECUTIVE ASSISTANT TO THE CHIEF FINANCIAL OFFICER OF THE COMPANY. THIS OTHER EMPLOYEE, WHO WAS ALSO A RACIAL MINORITY EMPLOYEE (AFRICAN AMERICAN MALE), ACCORDING TO MR. MAIRENA, ASKED TO BECOME AN ACCOMPLICE WITH MR. MAIRENA IN DIVERTING FUNDS FROM THE COMPANY FOR HIS AND MR. MAIRENA'S PERSONAL ILLEGAL GAIN. MR. MAIRENA'S ACCOMPLICE IN THIS ILLEGAL DIVERSION OF FUNDS FROM THE COMPANY RESIGNED FROM THE COMPANY IN FEBRUARY OF 2005 AND LATER, ACCORDING TO MR. MAIRENA, FILED AN EMPLOYMENT DISCRIMINATION SUIT AGAINST THE COMPANY. MR. MAIRENA HAD BEEN IN

4

DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

TELEPHONIC CONTACT WITH THIS INDIVIDUAL APPROXIMATELY EVERY TWO
WEEKS UNTIL THE INDIVIDUAL'S DISCRIMINATION LAWSUIT WAS FILED, AT
WHICH POINT UPON ADVICE, ALLEGEDLY OF THIS INDIVIDUAL'S COUNSEL,
COMMUNICATION WAS SUSPENDED.  MR. MAIRENA INDICATED HE DID NOT
KNOW THE OUTCOME OF THE DISCRIMINATION LAWSUIT.


DURING THE COURSE OF HIS EMPLOYMENT WITH THE *FEDERATION OF
AMERICAN HOSPITALS*, MR. MAIRENA BECAME AN UNHAPPY AND
DISGRUNTLED EMPLOYEE.  HE FELT THAT HE WAS DEVALUED BY COMPANY
MANAGEMENT, PARTLY BECAUSE HE WAS A MINORITY EMPLOYEE.  HE WAS
INFORMED HE HAD NO REASONABLE PROSPECT OF ADVANCEMENT, DESPITE
THE FACT THAT HE WORKED VERY HARD AT HIS JOB.  IN THE COURSE OF HIS
EMPLOYMENT HE BECAME AWARE OF PAYMENTS MADE BY THE COMPANY
FOR PERSONAL EXPENDITURES OF CERTAIN MANAGEMENT EMPLOYEES
WHICH MR. MAIRENA KNEW TO BE IMPROPER.  HE WAS ALSO AWARE THAT
WHEN SOME ACCOUNTING BALANCES DID NOT RECONCILE (PRIOR TO THE
COMMISSION OF HIS OWN ILLEGAL ACTS) THAT IMPROPER ACCOUNTING
PRACTICES HAD BEEN USED TO COVER UP THE "VARIANCES".  MR. MAIRENA
CAME TO CONCLUDE, FROM HIS PERSPECIVE, THAT HE WAS WORKING IN A
MANAGEMENT ENVIRONMENT OF "A CULTURE OF GREED".  AT ONE POINT HE
ADVISED MANAGEMENT THAT HE WAS GOING TO INFORM THE AUDITORS OF
THESE IMPOPER PRACTICES, AND HE IN FACT DID SO.  THE AUDITORS
AGREED WITH HIM, ALLEGEDLY, BUT NO ACTION WAS TAKE BY
MANAGEMENT AUTHORITIES ACCORDING TO MR. MAIRENA INASMUCH AS
THEY WERE POLITICALLY PROTECTIVE OF THEMSELVES AND OTHERS WHO
HAD IMPROPERLY USED COMPANY FUNDS FOR PERSONAL PURPOSES. AS A
RESULT OF THE CONTRAST OF THIS MANAGEMENT GREED, AS MR. MAIRENA
PERCEIVED IT, WITH THEIR DEVALUATION AND ABUSE OF HIM, AS HE
PERCEIVED IT, HE CONCEIVED OF, AND IN FACT BEGAN, A PROCESS OF

**Sidney C. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

DIVERTING COMPANY FUNDS TO HIMSELF AS AN ACT OF RETALIATION
AGAINST HIS EMPLOYER. IN SHORT, HE DECIDED THAT HE WOULD BEAT
THEM AT THEIR OWN GAME, ALBEIT CLANDESTINELY AND ALBEIT
ILLEGALLY, BY DIVERTING COMPANY FUNDS TO HIMSELF WHICH HE DID DO
FROM 2003 UNTIL 2005 AND IN THE AMOUNT, ALLEGEDLY, OF $377,000.
ACCORDING TO MR. MAIRENA, HE DID NOT NEED THE MONEY TO LEAD A
NORMAL FAMILY LIFESTYLE, AS HE AND HIS WIFE HAD A COMBINED
ANNUAL INCOME IN EXCESS OF $200,000 PER ANNUM. HOWEVER,
CONSISTENT WITH HIS RESENTMENT OF HIS COMPANY MANAGEMENT
EMPLOYEES SPENDING COMPANY MONEY LAVISHLY UPON THEMSELVES,
MR. MAIRENA, IN KIND, INDULGED HIMSELF IN A LAVISH LIFESTYLE
SUPPORTED BY HIS ILLEGALLY OBTAINED FUNDS FROM HIS COMPANY.

AT ALL TIMES, DURING THE COMMISSION OF HIS ILLEGAL ACTS AGAINST HIS
COMPANY, MR. MAIRENA KNEW THAT HIS BEHAVIOR WAS WRONG.
ADDITIONALLY, ALSO, AT ALL TIMES HE KNEW THAT HE WOULD
ULTIMATELY BE DISCOVERED FOR HIS CRIMES. NEVERTHELESS,
IRRATIONALLY HE PERSISTED IN HIS CONDUCT AGAINST HIS COMPANY
EMPLOYER. HE SUMMED HIS CIRCUMSTANCES UP WITH THE STATEMENT, "I
KNEW THE TRAIN WAS GOING TO WRECK, I JUST DIDN'T KNOW WHEN!" HE
INDICATES THAT HE KNOWS THE RATIONAL THING TO DO WOULD HAVE
BEEN TO RESIGN FROM HIS EMPLOYMENT, BUT THAT HE DID NOT CONSIDER
THIS AS HIS THINKING WAS COLORED BY HIS ANGER AGAINST HIS
EMPLOYER IN RETALIATION FOR THEIR MISTREATMENT OF HIM, AND ALSO
BECAUSE HE SAW RESIGNING AS A "FAILURE" ON HIS PART, AND AN ACT
WHICH DIMINISHED HIS SELF-ESTEEM, PARTICULARLY GIVEN HIS DEVALUED
RELATIONSHIP WITH HIS EMPLOYER. DURING THE COMMISSION OF HIS
CRIMES HE FELT BOTH GUILTY AND REMORSEFUL, AND HE ALSO FELT SOME
SATISFACTION THAT HE HAD RETALIATED CLANDESTINELY AGAINST HIS

6

Sidney C. Brooks, M.D.
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

EMPLOYER, AND THAT DUE TO WHAT HE REGARDED AS THEIR HISTORY OF GREED AND ACCOUNTING INCOMPETENCE AND IMPROPRIETIES THAT THEY MIGHT WELL IGNORE THE ACCOUNTING "VARIANCES" AS THEY HAD DONE IN THE PAST, AND WHICH WERE CAUSED IN THE INSTANT OFFENSE BY HIS DIVERSION OF COMPANY FUNDS TO HIMSELF.

IN THE AFTERMATH OF HIS RESIGNATION FROM HIS EMPLOYER, THE *FEDERATION OF AMERICAN HOSPITALS*, MR. MAIRENA HAD A NUMBER OF CONTACTS WITH PRIOR EMPLOYEES OF THE COMPANY, INCLUDING COMPANY MAGANAGEMENT EMPLOYEES. THESE CONTACTS RESULTED IN EVER INTENSE MIXED EMOTIONS IN MR. MAIRENA, INCLUDING INCREASING GUILT, REMORSE FOR HIS CRIMES, PHANTASIES OF APPREHENSION (ALBEIT IRRATIONAL), ANXIETY, DEPRESSION, AND CONTINUING ANGER (ALBEIT PROGRESSIVELY DIMINISHED). MR. MAIRENA STRUGGLED WITH MIXED EMOTIONS AND THOUGHTS ABOUT ADMITTING TO HIS CRIMES AGAINST HIS EMPLOYER, PARTICULARLY DURING A PERIOD OF A COMPANY AUDIT WHEN HE WAS INFORMED THE "AUDIT WAS GOING WELL" (AND THAT HIS CRIMES WERE NOT BEING DETECTED), AND ALSO WHEN HE WAS INFORMED THAT "BANK STATEMENTS WERE MISSING" AND THAT "BANK STATEMENTS WERE BEING OBTAINED FROM THE BANK" FOR RECONCILIATION BY THE AUDITORS (AND THAT HIS CRIMES COULD BE DETECTED ASSUMING A COMPETENT AUDIT AT THE COMPANY). MR. MAIRENA THEN HAD A DREAM AND IN WHICH DREAM HIS LITTLE DAUGHTER SAID TO HIM, "HOW COULD YOU HAVE DONE THIS DADDY?" AT THIS POINT MR. MAIRENA DECIDED TO OBTAIN COUNSEL WITH THE INTENT OF TURNING HIMSELF IN. HE OBTAINED THE NAME OF MS. LESLIE MCADOO FROM HIS ACCOMPLICE IN COMMITTING HIS CRIMES AGAINST THE COMPANY. IN A SUBSEQUENT TELEPHONE CALL WITH HIS ACCOMPLICE, HIS ACCOMPLICE ADVISED HIM NOT TO TURN HIMSELF IN. MR. MAIRENA SPURNED THIS ADVICE AND ADVISED HIS ACCOMPLICE THAT HE

Sidney C. Brooks, M.D.
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

WANTED TO GET THE MATTER OVER, ADMIT HIS GUILT, AND MAKE
RESTITUTION TO THE COMPANY. AT THIS MR. MAIRENA REPORTS THAT HE
HAD THOUGHTS OF HIS MOTHER WHO TAUGHT HIM THAT "ERRORS CAN BE
CORRECTED", AND THAT HE WANTED TO CORRECT HIS ERRORS AND TO
RESTITUTE THE DAMAGES WHICH HE CAUSED HIS EMPLOYER. MS. MCADOO,
CONSEQUENTLY, ADVISED THE COMPANY'S COUNSEL ON OR ABOUT 02.22.06
OF MR. MAIRENA'S CRIMES AGAINST THE COMPANY. MR. MAIRENA WITH
ASSISTANCE OF COUNSEL, ADVISED HIS WIFE OF HIS MISDEEDS AT HIS
EMPLOYMENT.

FOLLOWING AN INVESTIGATION BY AUTHORITIES WHICH CONFIRMED HIS
CRIMES, MR. MAIRENA WAS ARRAIGNED ON JANUARY 10, 2007. SENTENCING
BEFORE THE COURT, HAS BEEN SCHEDULED FOR APRIL 16, 2007.

## PSYCHIATRIC PROBLEMS

MR. MAIRENA SUFFERS FROM DIAGNOSES OF DEPRESSION NOS (WITH
POTENTIAL LATENT MAJOR DEPRESSION AND / OR BIPOLAR DISORDER),
ANXIETY NOS, AND AN OBSESSIVE COMPULSIVE PERSONALITY. THESE
DIAGNOSES WERE EVIDENT AT THE TIME OF HIS INITIAL FORENSIC
PSYCHIATRIC EXAMINATION ON 02.22.06. ADDITIONALLY, IN THE CONTEXT
OF FOLLOW-UP EXAMINATIONS CONDUCTED BY THIS EXAMINER,
TELEPHONIC CONSULTATIONS WITH MR. MAIRENA'S COUNSEL, MS. MCADOO,
AND REVIEW OF THE PROBATION EXAMINER'S REPORT, IT IS APPARENT THAT
MR. MAIRENA IS SUFFERING FROM MASOCHISTIC (SELF-DESTRUCTIVE)
PERSONALITY TRAITS, AND ALSO FROM SOME MEMORY AND / OR
INFORMATION PROCESSING PROBLEMS. THESE DIAGNOSES ARE IMPORTANT
TO UNDERSTANDING MR. MAIRENA'S PROBLEMS, BUT DO NOT FULLY
EXPLAIN THEM, AND ALSO DO NOT ADEQUATELY DESCRIBE HIS MENTAL

DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

AND EMOTIONAL FUNCTIONING. THEREFORE, THE FOLLOWING SYMPTOM
CATEGORIES WILL BE DELINEATED TO MORE ADEQUATELY REVEAL MR.
MAIRENA'S MENTAL, EMOTIONAL, AND BEHAVIORAL STATES AND
FUNCTIONING, AS ARE, IN THE JUDGMENT OF THIS EXAMINER, POTENTIALLY
RELEVANT TO THE COMMISSION OF HIS CRIME AND TO CONSIDERATIONS IN
HIS SENTENCING:

**INSIGHT**

MR. MAIRENA HAS EXTREMELY POOR INSIGHT. HE DOES NOT UNDERSTAND
THE RELATIONSHIP BETWEEN HIS THINKING AND HIS EMOTIONS. HE
CANNOT EXPLAIN IN ANY MEANINGFUL MANNER HOW HE COULD HAVE
ALLOWED HIS ANGER TO DOMINATE HIS RATIONAL THOUGHT PROCESSES IN
THE DECISIONS TO COMMIT HIS CRIMINAL ACTS AGAINST HIS EMPLOYER.
WHEN ASKED TO PROVIDE SOME EXPLANATION AS TO HOW THIS COULD
HAVE OCCURRED, HE CAN ONLY STATE, "THAT IS THE MILLION DOLLAR
QUESTION? I DON'T KNOW. I DON'T KNOW WHY I JUST DIDN'T RESIGN
[BEFORE THE COMMISSION OF HIS CRIMES]." SIMILARLY, HE CANNOT
EXPLAIN, AND HAS NO REASONABLE SPECULATIVE IDEA AS TO HOW HE
COULD HAVE COMMITTED THIS CRIME, WHICH IS COMPLETELY CONTRARY
TO HIS PREVIOUS LIFETIME OF AN EXEMPLARY AND SUCCESSFUL LIFE.

**SELF-ESTEEM**

MR. MAIRENA, IN PROFESSIONAL CONVERSATIONS WITH THIS EXAMINER,
HAS ONLY BEGUN TO UNDERSTAND THE DEPTH OF HIS POOR SELF-ESTEEM,
AS A MAN, AS A PROFESSIONAL, AND AS AN INDIVIDUAL OF MINORITY
HISPANIC DESCENT. HE DOES HAVE SOME BEGINNING IDEA THAT HIS
ALIGNMENT WITH ANOTHER INDIVIDUAL MINORITY MALE AFRICAN

9

**Sidney G. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

AMERICAN AS HIS ACCOMPLICE IN HIS CRIME WAS DUE TO HIS SHARED
SENSE OF POOR SELF-ESTEEM WITH HIS ACCOMPLICE AND ALSO TO HIS DEEP
RESENTMENT AT THE EMPLOYMENT ABUSE TO WHICH HE AND HIS
ACCOMPLICE WERE SUBJECT IN THEIR PLACE OF EMPLOYMENT. HE DOES
NOT UNDERSTAND THE EXTENT TO WHICH HE IS DEPENDENT UPON THE
VALIDATION OF OTHERS IN HIS SELF-EVALUATION AND IN RELATED SELF-
DECISION MAKING.

**SELF-DESTRUCTIVENESS**

MR. MAIRENA'S COMMISSION OF HIS CRIME, WITH PERSISTING AND
CONTINUING ACTS AGAINST HIS EMPLOYER, COUPLED WITH THE CERTAIN
KNOWLEDGE AND BELIEF THAT HE WOULD EVENTUALLY BE CAUGHT
REVEALS BOTH A DEFECT IN HIS THINKING AS WELL AS AN INVITATION TO
PUNISHMENT. MR. MAIRENA AT SOME LEVEL APPEARS TO INVITE SUFFERING
UPON HIMSELF. THIS TREND IN HIS PERSONALITY IS ALSO REVEALED IN HIS
PHANTASIES THAT HE MUST APPROACH HIS FATE WITH THE WILL OF A
"ROMAN CENTURION" AND SUBJECT HIMSELF TO THE MOST PAINFUL
EXPERIENCES IN BATTLE (ANALOGOUSLY IN HIS LIFE TO THE MOST PAINFUL
OF PUNITIVE EXPERIENCES IN RETRIBUTION FOR HIS CRIME). HIS
PERCEPTIONS APPEAR TO FOCUS MORE UPON THE NEED TO SUFFER, RATHER
THAN THE NEED TO LEARN ABOUT HIMSELF, AND TO CORRECT HIMSELF,
AND TO ACHIEVE UNDERSTANDING OF HIS PROBLEMS AND HOW THEY WERE
RELATED TO THE ULTIMATE COMMISSION OF HIS CRIME. PROXIMATE TO THE
TIME OF THE DISCLOSUE OF HIS CRIME HE WAS SIGNIFICANTLY SUICIDAL.
HIS SUICIDAL INTENT IS PRESENTLY ALLEGEDLY RESOLVED.

**Sidney C. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

## GRANDIOSITY

ELEMENTS OF GRANDIOSITY ARE PERIODICALLY EVIDENT IN MR. MAIRENA'S THNINKING AS REVEALED IN HIS BELIEF'S THAT HE HAD OUTSMARTED HIS EMPLOYER IN HIS DIVERSION OF COMPANY FUNDS AND WOULD NOT BE DETECTED DUE TO HIS EMPLOYER'S GROSSLY INCOMPETENT ACCOUNTING PRACTICES [WHILE CONTRADICTORILY HOLDING THE SIMULTANEOUS BELIEF THAT HE WOULD INVARIABLY BE CAUGHT]. HIS IDENTIFICATION WITH THE "ROMAN CENTURION" SUBJECTING HIMSELF TO WHATEVER PUNISHMENT IS INFLICTED UPON HIM BELIES SIMILARLY SOME GRANDIOSITY. THE GRANDIOSITY IS LIKELY A COMPENSATION FOR HIS EXCEEDINGLY POOR SELF ESTEEM, AND MAY ALSO BE RELATED TO LATENT BIPOLAR TRENDS ALBEIT PRESENTLY INCOMPLETELY MANIFEST.

## AFFECT AND MOOD

CONSISTENT WITH MANY INDIVIDUALS WHO EXHIBIT OBSESSIVE COMPULSIVE PERSONALITIES, MR. MAIRENA DOES NOT READILY REVEAL HIS EMOTIONS, VERBALLY AND / OR NON-VERBALLY. HE MASKS HIS HIGH LEVEL OF INTERNAL ANXIETY AND RELATED DEPRESSION AND HIS ANGER. HE DOES NOT EASILY PUT HIS EMOTIONS INTO WORDS, AND HE ALSO DOES NOT APPROPRIATELY DEAL WITH HIS EMOTIONS. HIS EMOTIONS AND THOUGHT PROCESSES BECOME BIFURCATED. HE CLEARLY DOES NOT UNDERSTAND THIS ATTRIBUTE IN HIMSELF, PARTICULARLY, AND DOES NOT UNDERSTAND HOW THIS PHENOMENON CAN UNCONSCIOUSLY AFFECT HIS THOUGHT PROCESSES AND DECISIONS. HIS FAILURE TO UNDERSTAND HOW HIS ANGER TOWARD HIS EMPLOYER COULD HAVE BEEN EXPRESSED IN THE COMMISSION OF HIS CRIME, THEREBY OVERRIDING HIS CONSCIOUS THOUGHT PROCESSES AND DECISIONAL ATTENUATION OF HIS ANGER, WHICH SHOULD HAVE

11

**Sidney C. Brooks, M.D.**
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

OCCURRED, BUT DID NOT, IS REFLECTIVE OF THIS EMOTIONAL / THINKING
BIFURCATION IN HIS OBSESSIONALLY DRIVEN PERSONALITY. THOUGH NOT
SUPERFICIALLY APPEARING ANXIOUS AND DEPRESSED, HE ASSUREDLY IS SO
UPON THOROUGH EXAMINATION.

**MEMORY IMPAIRMENTS**

IN THE COURSE OF FOLLOW-UP EXAMINATIONS OF MR. MAIRENA AND IN THE
PROCESS OF REVIEWING COMMUNICATIONS BETWEEN HIMSELF AND OTHERS
IN RELATION TO THIS EXAMINER, IT HAS BECOME APPARENT THAT MR.
MAIRENA IS EITHER NOT PROCESSING SOME INFORMATION ADEQUATELY,
OR IS HAVING MEMORY RECALL PROBLEMS. EXAMPLES OF THIS ARE TO BE
FOUND IN SEVERAL FACTUAL DISCREPANCIES. FOR EXAMPLE, HE INFORMED
THIS EXAMINER THAT HE BECAME A NATURALIZED CITIZEN IN 1987
WHEREAS THE PROBATION EXAMINERS REPORT INDICATES IT OCCURRED IN
1993. SIMILARLY, HE RELATED TO THIS EXAMINER THAT HE HAD DIVERTED
$190,000 OF HIS EMPLOYERS MONEY ILLEGALLY TO HIMSELF, WHERE, IN
FACT, THE AMOUNT DIVERTED WAS APPROXIMATELY $377,000.
ADDITIONALLY, AND MOST EGREGIOUSLY HE COULD NOT RELATE TO THIS
EXAMINER ANY FACTS CONCERNING HIS COMMUNICATIONS WITH HIS
ACCOMPLICE CONSEQUENT TO HIS DECISION TO REVEAL HIS CRIMES,
WHEREUPON NOT MORE THAN FIFTEEN MINUTES LATER IN THE PRESENCE OF
THIS EXAMINER, HIS COUNSEL MS. MCADOO, AND FORENSIC POLYGRAPHER,
HE RELATED IN DETAIL HIS CONVERSATIONS WITH HIS ACCOMPLICE AND HIS
REPUDIATION OF HIS ACCOMPLICE'S ADVICE NOT TO DISCLOSE HIS CRIMES
VOLUNTARILY. CLEARLY, THESE MEMORY DISTURBANCES DO NOT APPEAR
WILLFULL, AND ARE NOT MALINGERED AS MR. MAIRENA WOULD RECEIVE
NO BENEFIT FROM THE MEMORY DISCREPANCIES. IN FACT, HE CAUSES
HIMSELF DIFFICULTIES IN HIS LAPSES. DUE TO HIS MEMORY DIFFICULTIES

Sidney C. Brooks, M.D.
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

AND / OR INFORMATIONAL PROCESSING AND RESPONSE PROBLEMS A
POLYGRAPH EXAMINATION OF MR. MAIRENA WAS NOT POSSIBLE IN THE
OPINION OF THE POLYGRAPHER WHO FELT THAT RELIABLE RESULTS COULD
NOT BE OBTAINED. THE CAUSE OF THESE MEMORY PROBLEMS IS LIKELY MR.
MAIRENA'S HIGH INTERNAL ANXIETY WHICH IS DISORGANIZING. HOWEVER,
OTHER POSSIBILITIES EXIST BUT CANNOT BE DETERMINED WITHOUT
PSYCHOLOGICAL TESTING.


**IRRATIONALITY**


MR. MAIRENA'S COMMISSION OF HIS CRIME WAS COMPLETELY CONTRARY
TO HIS ENTIRE PRIOR LIFE HISTORY OF LAWFUL BEHAVIOR. IT ALSO
OCCURRED IN THE BELIEF BY HIM THAT HE WOULD BE ULTIMATELY
CAUGHT, BUT ALSO WITH THE COUNTERVEILLING BELIEF THAT HE WOULD
NOT BE CAUGHT DUE TO THE GREED AND INCOMPETENCE OF HIS EMPLOYER.
MR. MAIRENA GAVE NO THOUGHT WHATSOEVER, BY HIS OWN ADMISSION,
AS TO THE CONSEQUENCES TO HIS WIFE AND TWO SMALL CHILDREN IN THE
COMMISSION OF HIS CRIME. HE GAVE NO REASONED CONSIDERATION TO
THE CONSEQUENCES TO HIMSELF CONTRADICTORILY AND
SIMULTANEOUSLY ENTERTAINING THE THOUGHTS THAT HE "WOULD AND
WOULD NOT BE CAUGHT". HE COMMITTED HIS CRIME IRRATIONALLY WITH
THE KNOWLEDGE THAT IT WAS WRONG AND CONTRARY TO HIS ENTIRE
LIFETIME OF EXPERIENCE AND LEARNED VALUES. THE CRIME COMMITTED
BY MR. MAIRENA WAS NOT MOTIVATED BY THE NECESSITY FOR FINANCIAL
GAIN. THE CRIME COMMITTED BY MR. MAIRENA WAS IN RESPONSE TO HIS
ANGER AT HIS EMPLOYER. HIS DECISION TO COMMITT HIS CRIME,
PARTICULARLY WITH REPEATED AND CONTINUING ACTS OF DIVERSION OF
FUNDS TO HIMSELF FROM HIS EMPLOYER, HAS NO REASONED FOUNDATION

13

Sidney C. Brooks, M.D.
DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

PSYCHOLOGICALLY BEYOND RETALIATION AGAINST HIS EMPLOYER FOR WHAT HE PERCEIVED AS HIS EMPLOYER'S DISCRIMINATION AGAINST HIM. THAT DECISION IS PARTICULARLY IRRATIONAL IN THE CONTEXT OF IGNORING, AND IN FACT, NOT EVEN CONSIDERING, THE CONSEQUENCES OF HIS DECISION AND ITS DEPARTURE FROM HIS ENTIRE LIFETIME OF LAWFUL AND REASONED CONDUCT.

## CONCLUSION

MR. MAIRENA APPEARS PSYCHIATRICALLY INTACT AND DOES SO SUPERFICIALLY. HE IS IN FACT PSYCHIATRICALLY DISTURBED WITH UNDERLYING SELF-DESTRUCTIVE MOTIVATIONS WHICH HE DOES NOT UNDERSTAND. HE DEMONSTRATES DEFICITS IN REASON, VERY POOR INSIGHT, SOME GRANDIOSITY, APPARENT MEMORY IMPAIRMENTS, HIGH INTERNAL ANXIETY, DEPRESSION, SEPARATION OF HIS EMOTIONS AND RATIONAL THOUGHT PROCESSES, AND OBSESSIVE COMPULSIVE PERSONALITY PATTERNS GENERALLY. HE IS IN NEED OF PSYCHIATRIC TREAMENT, PARTICULARLY PSYCHOTHERAPY AND LIKELY MEDICATION INTERVENTION.

DESPITE HIS PSYCHIATRIC PROBLEMS, HE DOES NOT REPRESENT AN IMMINENT DANGER TO THE COMMUNITY AND COULD BE SAFELY INCARCERATED AND TREATED IN A MINIMAL SECURITY ENVIRONMENT AS THE COURT MAY ALLOW. HIS PROGNOSIS IS GOOD WITH TREATMENT, BUT FAIR TO POOR WITHOUT TREATMENT. IN THE JUDGEMENT OF THIS EXAMINER MR. MAIRENA SHOULD BE REQUIRED TO OBTAIN PSYCHIATRIC TREATMENT AS A CONDITION OF HIS SENTENCING IN ANY FORM OF INCARCERATION AND / OR PROBATION.

**Sidney C. Brooks, M.D.**

DBA "PFPSS"
Professional Forensic Psychiatric Science Services, Inc.
127 S. Fairfax Street
Suite 450
Alexandria, VA 22314
USA
Phone 703-912-7400
scbrooksmd@aol.com

THANK YOU FOR THE OPPORTUNITY TO BE OF SERVICE IN THIS CASE.

RESPECTFULLY SUBMITTED,

SIDNEY C. BROOKS, M.D.

## FORENSIC PSYCHIATRIC EXAMINATION

### IN THE MATTER OF:

DOUGLAS MAIRENA AND EMPLOYER

### CLIENT:

DOUGLAS MAIRENA

### CLIENT'S COUNSEL:

LESLIE MCADOO

### OPPOSING COUNSEL:

UNKNOWN

### PSYCHIATRIC EXAMINER:

SIDNEY C. BROOKS, M.D.

### DATE OF EXAMINATION:

02.22.06

### IDENTIFYING DATA:

MR. DOUGLAS DAVID MAIRENA IS A 39 YEAR OLD MARRIED MALE OF HISPANIC DESCENT
WITH BIRTHDATE OF 10.25.66 WHO RESIDES AT 3150 COLLIE LANE, FALLS CHURCH,
VIRGINIA 22044. HE REPORTS AS A TELEPHONE NUMBER AT THAT ADDRESS OF 703-534-
7136 AND A WORK TELEPHONE NUMBER OF 202-739-9437. MR. MAIRENA INDICATES THAT
HE WAS BORN IN NICARAUGA AND BECAME A NATURALIZED U.S. CITIZEN IN 1987. HE IS
EMPLOYED AS A COMPTROLLER WITH THE NATIONAL ASSOCIATION OF REAL ESTATE
INVESTMENT TRUST AND HAS BEEN IN THIS POSITION FOR THREE MONTHS. HE HOLDS
AN MBA DEGREE FROM JOHNS HOPKINS UNIVERSITY (2003), A BS DEGREE FROM
STRAYER UNIVERSITY IN ACCOUNTING (1999), AND A HIGH SCHOOL DEGREE OBTAINED
FROM JEB STEWART HIGH SCHOOL IN FALLS CHURCH VIRGINIA. IN THE COURSE OF HIS
EMPLOYMENT HE DENIES ANY HISTORY OF TERMINATIONS OR DISCIPLINARY ACTIONS
BY ANY EMPLOYER AND HE DENIES FILING ANY ACTIONS AGAINST ANY EMPLOYER. HE
SERVED IN THE U.S. ARMY NATIONAL GUARD FROM 1985 - 1988 AND WAS STATIONED AT
FREDRICKSBURG, VIRGINIA. HE OBTAINED THE RANK OF SPECIALIST. HE RECEIVED AN
HONORABLE DISCHARGE FROM THE NATIONAL GUARD IN 1988 FOR MEDICAL REASONS
RELATED TO A HERNIATED LUMBAR DISK. HE HAS NO HISTORY OF ANY ARRESTS OR
CONVICTIONS. HE IS OF METHODIST PROTESTANT AFFILIATION AND SERVES AS THE
TREASURER OF HIS CHURCH.



### STATEMENT OF CLIENT'S RIGHTS:

THE ABOVE CAPTIONED CLIENT APPEARED BEFORE THIS EXAMINER ON THE ABOVE
CAPTIONED DATE UPON THE CLIENT'S REQUEST AND THE REQUEST OF THE CLIENT'S
COUNSEL FOR THE PURPOSES OF UNDERGOING A FORENSIC PSYCIATRIC EXAMINATION.
THE CLIENT WAS INFORMED THAT THE FACTS ELICITED IN THE EXAMINATION, THE
ANALYSIS OF SAID FACTS BY THIS PSYCHIATRIC EXAMINER, AND THE CONCLUSIONS
REACHED IN THE EXAMINATION PROCESS BY THIS EXAMINER WOULD NOT BE FULLY
PRIVILEGED AND COULD BE MADE AVAILABLE TO OPPOSING COUNSEL AND / OR THE
COURT AT THE ELECTION OF CLIENT'S COUNSEL AND / OR AS OTHERWISE MAY BE
REQUIRED BY LAW. THE CLIENT WAS INFORMED OF THE CLIENT'S RIGHT TO REFUSE TO
ANSWER ANY QUESTION ASKED BY THIS PSYCHIATRIC EXAMINER, AND WAS ALSO
ADVISED THAT THE REFUSAL TO ANSWER ANY QUESTION WOULD BE SO NOTED IN THE
EXAMINATION PROCESS. THE CLIENT WAS ADVISED THAT THE EXAMINATION WAS NOT
FOR TREATMENT PURPOSES AND DID NOT CONSTITUTE A CONTRACT FOR TREATMENT
NOR IN ANY WAY IMPOSED ANY OBLIGATION FOR TREATMENT UPON THIS PSYCHIATRIC
EXAMINER. THE CLIENT APPEARED TO BE COMPETENT TO CONSENT TO THE
EXAMINATION UPON APPEARANCE FOR THE EXAMINATION AND UPON EXPLANATION OF
CLIENT'S RIGHTS AT THE INCEPTION OF THE EXAMINATION. THE CLIENT RELATED NO
COERSION IN CONSENTING TO THE EXAMINATION, (EXCEPT AS MAY HAVE BEEN
ORDERED BY THE COURT), AND APPEARED TO UNDERSTAND THE PURPOSES AND
LIMITATIONS IN THE CONFIDENTIALITY OF THE EXAMINATION. UPON EXPLANATION AS
DELINIATED HEREIN, THE CLIENT REQUESTED THAT THE EXAMINATION PROCEED.

### CHIEF COMPLAINT:

MR. MAIRENA INDICATES HIS PRIMARY CONCERN IS HIS ACTIONS WHICH HE TOOK
AGAINST HIS PRIOR EMPLOYER, THE FEDERATION OF AMERICAN HOSPITALS, AND HE
STATES, "I'M REMORSEFUL FOR WHAT I DID."

### HISTORY OF PRESENT PROBLEM:

MR. MAIRENA INDICATES THAT HE WAS EMPLOYED BY THE FEDERATION OF AMERICAN
HOSPITALS FOR FOUR AND ONE HALF YEARS FROM JUNE 2001 THROUGH NOVEMBER 2005
AND FROM WHICH EMPLOYER HE RESIGNED AS THE COMPTROLLER TO ASSUME HIS
PRESENT POSITION WITH THE NATIONAL ASSOCIATION OF REAL ESTATE INVESTMENT
TRUST AS ITS COMPTROLLER. APPROXIMATELY 2 WEEKS PRIOR TO THIS EXAMINATION,
MR. MAIRENA INDICATES THAT HE RECEIVED A MEMO AND TELEPHONE CALL FROM HIS
PREVIOUS SUPERVISOR, MR. SPIEL, AT THE FEDERATED HOSPITAL ASSOCIATION, WHO

ADVISED MR. MARIENA THAT "SOME BANK STATEMENTS ARE MISSING" AND MAKING INQUIRY OF MR. MAIRENA AS TO WHERE THEY WERE. MR. MAIRENA TOLD MR. SPIEL THAT HE DID NOT KNOW WHERE THEY WERE, TO WHICH MR. SPIEL REPLIED THAT THE "AUDITORS WILL GET THE STATEMENTS FROM THE BANK AND WILL RECONCILE THE ACCOUNTS." MR. MAIRENA SHORTLY THEREAFTER INDICATES THAT HE "HAD A PANIC ATTACK", BECAUSE HE KNEW THAT HE, HIMSELF, HAD DESTROYED THE STATEMENTS TO CONCEAL THE FACT THAT FROM THE FALL OF 2003 UNTIL SEPTEMBER OF 2005 HE HAD ADMITTEDLY DEFRAUDED HIS EMPLOYER, AND PURLOINED FROM HIS EMPLOYER, AT THE TIME MONIES IN THE AMOUNT IN THE AGGREGATE TO APPROXIMATELY $190,000. HE INDICATES THAT THIS AMOUNT WAS UNREPORTED IN THE COMPANY ACCOUNTING BALANCE SHEETS. MR. MAIRENA INDICATED THAT HE CONCEALED THESE DIVERSION OF FUNDS TO HIMSELF BY ALTERING CHECKS PREVIOUSLY SIGNED BY HIS EMPLOYER AND MADE PAYABLE TO A VENDOR AND BY MAKING THE CHECKS MADE PAYABLE TO HIMSELF INSTEAD. HE INDICATES THAT TO PREVENT DISCOVERY OF HIS TRANSACTIONS HE SUBSEQUENTLY ALTERED THE BOOKS AND BALANCES AND THEN SHREDDED THE CANCELLED CHECKS. WITH THE PROSPECT OF DISCOVERY OF HIS MISDEEDS NOW PROBABLE, MR. MAIRENA IMMEDIATELY CONSULTED WITH LEGAL COUNSEL, MS. LESLIE MCADOO WHOM HE ALLEGEDLY MET WITH FIRST ON 02.16.06 AT 11:00 A.M. ADDITIONALLY, ON 02.21.06 AT 5:00 P.M., MR. MAIRENA ADVISED HIS WIFE THAT HE "HAD A PROBLEM WITH HIS PREVIOUS EMPLOYER AND NEEDED TO MEET WITH HER AND HIS COUNSEL" IN HIS COUNSEL'S OFFICE, AND SUBSEQUENT TO WHICH MEETING HIS WIFE LEARNED OF HIS MISDEEDS WITH HIS PREVIOUS EMPLOYER WHICH HE HAD CONCEALED FROM HER. FOLLOWING THIS MEETING WITH HIS WIFE MR. MAIRENA INDICATES THAT HE TALKED WITH HIS WIFE UNTIL MIDNIGHT AND THAT ALTHOUGH SHE WAS VERY UPSET AND ANGRY WITH HIM SHE PLEDGED HER SUPPORT TO HIM IN RESOLVING THE MATTER. MR. MAIRENA INDICATES THAT HE HAS MADE NO OTHER DISCLOSURES OF HIS MISDEEDS TO ANY OTHER PARTIES AS HE DENIES HAVING ANY CLOSE CONFIDANTS AND DOES NOT FULLY TRUST HIS CHURCH PASTOR TO PROTECT THE CONFIDENTIALITY OF THE MATTER. IN THAT REGARD, HE DENIED TAKING ANY MONEY FROM HIS CHURCH IN HIS CAPACITY AS THE CHURCH TREASURER. HE ALSO DENIED ENGAGING IN ANY SIMILAR MISDEEDS AGAINST ANY OTHER PRIOR EMPLOYER OR AGAINST ANY OTHER PARTY WHATSOEVER. PURSUANT TO THESE DISCLOSURES, AND UPON ADVICE OF HIS COUNSEL, MS. LESLIE MCADOO, MR. MAIRENA MADE DISCLOSURE OF THESE MATTERS TO THIS EXAMINER. IMMEDIATELY PRIOR TO THE INCEPTION OF THIS EXAMINATION, ON 02.22.06, MR. MAIRENA'S COUNSEL, MS. MCADOO, INDICATED TO THIS EXAMINER HER INTENT TO MAKE DISCLOSURE TO THE MATTERS AT HAND CONCERNING MR. MAIRENA TO HIS PRIOR EMPLOYER'S COUNSEL.

3

MR. MAIRENA INDICATES THAT SINCE THE NOTICE TO HIM FROM HIS EMPLOYER OF THE MISSING BANK STATEMENTS AND UP UNTIL THE TIME OF THIS PRESENT EXAMINATION ON THIS DATE OF 02.22.06, HE HAS NOT SLEPT EXCEPT FOR VERY BRIEF MOMENTS FOR TWO WEEKS. HE ALSO INDICATES THAT HE HAS HAD SEVERE LOSS OF APPETITE AND HAS LOST 5 POUNDS. HE REPORTS THAT DURING HIS BRIEF PERIODS OF SLEEP HE HAS HAD DREAMS OF BEING INCARCERATED AND OF "MY KIDS SEEING ME TAKEN AWAY IN A PADDY WAGON". HE STATES HE ALSO SEES HIMSELF "BEHIND BARS". HE STATES HE ALSO HAD "DREAMS OF DYING IN A CAR". HE INDICATES THAT HE HAD BEEN VERY DEPRESSED AND HAS HAD SUICIDAL THOUGHTS, BUT HAD FORMULATED NO EXACT DEFINITIVE PLAN TO ACT BUT THOUGHT THAT IT WOULD INVOLVE "DRIVING INTO A BARRIER". HE INDICATES THAT HIS LAST SUICIDAL THOUGHTS WERE THIS PAST WEEKEND PRIOR TO THIS EXAMINATION. HE INDICATES THAT HE FEELS VERY GUILTY FOR HIS ACTIONS AND THAT HE IS REMORSEFUL FOR WHAT HE DID. HE STATED THAT " I TOOK THE EASY WAY OUT" AND THAT HE "SHOULD HAVE BEEN A BETTER MAN." HE STATED THAT HE IS "A GOOD CHRISTIAN" AND THAT HE "HELPS OTHERS", BUT HE ALSO STATES THAT "AS A CHRISTIAN, I HAVE COMMITTED A SIN." HE REPORTS FEELING "ANXIOUS AND SCARED" AND FEELING "FRUSTRATED AND DOWN ON [HIMSELF]". HE DENIES HAVING ANY UNREALITY FEELINGS, HALLUCINATIONS, OR DELUSIONAL THOUGHTS. HE DOES REPORT, HOWEVER, FEELING A CONTINUED SENSE OF ANGER AT HIS PRIOR EMPLOYER ,THE FEDERATED HOSPITAL ASSOCIATION, AND PARTICULARLY TOWARD MR. SPIEL, HIS PAST IMMEDIATE SUPERVISOR, WHOM HE FELT VICTIMIZED HIM AND DISCRIMINATED AGAINST HIM (ALONG WITH OTHERS IN THE COMPANY) WHILE HE WAS EMPLOYED THERE.

MR. MAIRENA INDICATED THAT HE ENGAGED IN HIS MISDEEDS AGAINST HIS EMPLOYER OUT OF HIS ANGER AT WHAT HE PERCEIVED AS BEING CONTINUOUSLY DEVALUED, UNAPPRECIATED, DEMEANED, TREATED ABUSIVELY, AND DISCRIMINATED AGAINST AS A PERSON, AND SPECIFICALLY A PERSON OF HISPANIC HERITAGE, IN THE COMPANY WHICH WAS LARGELY CONTROLLED BY A CLIQUE WITHIN THE COMPANY AND THAT THEY WERE PRJUDICED AGAINST HIM AS A HISPANIC. HE ALSO INDICATED THAT HE FELT THAT HE WAS SIGNIFICANTLY UNDERPAID COMPARATIVELY IN THE MARKET PLACE COMPARED WITH COMPTROLLERS IN OTHER SIMILAR COMPANIES. HE FELT HE HAD NO PROSPECT OF ADVANCEMENT IN THE COMPANY AND THAT HE WAS TRAPPED. HE ALSO FELT THAT HIS SUPERIORS DID NOT LIKE HIM AND PARTICULARLY WERE RESENTFUL THAT HE HAD EXPOSED TO AUDITORS THEIR PATTERNS OF LAVISH AND IRRESPONSIBLE SPENDING OF COMPANY ASSETS AND FUNDS, PLACING THE COMPANY

AT RISK. IN VIEW OF HIS LOW PAY RATE, AS HE PERCEIVED IT, AND THEIR EXCESSIVE SPENDING OF COMPANY FUNDS (PARTICULARLY IMPROPERLY UPON THEMSELVES), AS HE DOCUMENTED TO AUDITORS, HE INDICATED THAT HIS ANGER TOWARD THEM WAS INTENSIFIED. HE INDICATED THAT HE DID NOT THINK RATIONALLY AND DID NOT HAVE THE CONFIDENCE TO SIMPLY LEAVE THE COMPANY AS HE CLEARLY BELIEVES HE SHOULD HAVE DONE.

MR. MAIRENA INDICATES THAT HE SPOKE WITH JOSEPHINE MARTIN, EXECUTIVE VICE-PRESIDENT, IN THE COMPANY AND ADVISED HE WANTED TO ADVANCE IN THE COMPANY. SHE ADVISED HIM THAT SHE WOULD SPEAK WITH MR. CHIP KAHN, THE COMPANY PRESIDENT, ON HIS BEHALF. MR. MAIRENA INDICATES, HOWEVER, THAT WHEN MR. STEVE SPIEL, CFO FOR HEALTH POLICY AND EXECUTIVE VICE-PRESIDENT, AND MR. MAIRENA'S DIRECT SUPERVISOR FOUND OUT ABOUT HIS INITIATIVE THROUGH MS. MARTIN, HE BECAME IRATE. HE INDICATED THAT IN THE SPRING OF 2003, MR. SPIEL HAD THREATENED HIM AND STATED TO HIM, " I DON'T CARE HOW SMART YOU ARE, YOU WILL NEVER BE PART OF MANAGEMENT HERE." MR. MAIRENA INDICATED THAT AT THIS TIME HE "FELT CRUSHED." HE INDICATED HE "CRIED ON THE WAY HOME." HE INDCATED THAT AT THIS TIME HIS WORK LOAD HAD INCREASED AND THAT HE HAD HAD PREVIOUSLY TO CARRY MANY BURDENS OF THE PRIOR COMPTROLLER ,WHO HAD BEEN FIRED BY THE COMPANY FOR SIGNING A CHECK TO HERSELF, BUT WHO ALSO HAD SUCCESSFULLY SUED THE COMPANY FOR AGE DISCRIMINATION IN JUNE OF 1999. MR. MAIRENA ALSO INDICATED THAT HE HAD BEEN HIRED ORIGINALLY BY MS. LAURA THEVENATE THE PRIOR CEO, WHOM MR. KAHN REPLACED, AND THAT SHE TOO HAD SUED THE COMPANY SUCCESSFULLY FOR WRONGFULL TERMINATION AND THAT HE BELIEVED THAT MR. KAHN DID NOT LIKE HIM BECAUSE OF HIS PRIOR POSITIVE ASSOCIATION WITH MS. THEVENATE. MR. MAIRENA INDICATED THAT MR. KAHN'S PLACING HIM IN THE SUMMER OF 2001 UNDER THE SUPERVISION OF MR. SPIEL , WHO HAD NO ACCOUNTING BACKGROUND WAS INDICATIVE OF HIS DISLIKE OF HIM. MR. MAIRENA INDICATED THAT  MR. KAHN RARELY SPOKE TO HIM AND HAD TOLD HIM THAT HE "WAS NOT IMPORTANT". IN THE FACE OF THESE ACTS TOWARD HIM WHICH MR. MAIRENA VIEWED AS DEMEANING, HE STATED THAT MR. KAHN WAS A BRAGGART ABOUT HOW MUCH MONEY HE WAS MAKING IN THE COMPANY, ALLEGEDLY $700,000. HE REPORTED SIMILARLY THAT MR. SPIEL WAS MAKING $215,000, MS. MARTIN $225,000, AND MS. VANGELTER (A PART-TIME EMPLOYEE) $150,000 PER YEAR. HE REPORTED THAT THESE SALARIES WERE IN RELATION TO HIS LOW SALARY OF $80,000 PER YEAR. MR. MAIRENA INDICATED THAT THERE WAS, IN ADDITION TO A "CULTURE OF GREED" IN THE COMPANY AS HE PERCEIVED IT, A CULTURE OF DISCRIMINATION ALSO. MR. MAIRENA INDICATES HE

5

WAS PRESENT WHEN MR. SPIEL REFERRED TO A FEMALE EMPLOYEE KNOWN TO BE A
LESBIAN, AS A "FUCKING CUNT DIKE." MR. MAIRENA INDICATED THAT HE CONTINUED
TO TRY AND DO HIS JOB AND THAT HE WARNED MR. SPIEL THAT MS. MARTIN HAD
MISMANAGED A $50,000 PROJECT, BUT LEARNED THAT MR. KAHN DID NOT LIKE HIS
ASSESSMENT. HE FURTHER ADVISED THAT MS. MARTIN HAD RUN UP EXPENSES OF
$60,000, BY THE WINTER OF 2002, WITH NO DOCUMENTING RECEIPTS. PREVIOUSLY, MR.
MAIRENA HAD NOTED THAT MS. MARTIN HAD RUN UP A $6,000 BILL AT THE BILTMORE
HOTEL IN PHOENIX AND , AT COMPANY EXPENSE, HAD FLOWN OUT HER CHILDREN AND
THEIR NANNY TO PHOENIX TO JOIN HER. IN THE FACE TO THESE IMPROPRIETIES, MR.
MAIRENA WARNED MR. SPIEL IN APRIL OF 2002 THAT HE WOULD "TELL THE AUDITORS"
OF THESE IMPROPRIETIES. MR. MAIRENA INDICATED THAT MR. SPIEL'S RESPONSE WAS "
YOU'RE NOT GOING TO RAT US OUT ARE YOU?". MR. MAIRENA INDICATED THAT WHEN
THE AUDITORS, BUCCHANAN AND MITCHELL, SUPPORTED MR. MAIRENA'S POSITION, MR.
KAHN AND MR. SPIEL "WENT THROUGH THE ROOF". MR. MAIRENA INDICATED THAT MR.
SPIEL TOOK NO ACTION AGAINST MS. MARTIN, HOWEVER, BECAUSE IN MR. MAIRENA'S
VIEW SHE WAS "MR. KAHN'S HATCHET WOMAN". WHEN A BOARD MEMBER, MR. PERRY,
WANTED MS. MARTIN DISMISSED, MR. KAHN DEFENDED HER. IN THE FACE OF THIS
COMPANY EMBARRASSMENT, AND THE AUDITOR'S VINDICATION OF MR. MAIRENA, MR.
MAIRENA STATES THAT MR. SPIEL NOW TOLD HIM HE WAS "DOING AN O.K. JOB."

BY THE SUMMER OF 2003, MR. MAIRENA INDICATES THAT HIS ANGER WAS GROWING AND
WAS MORE ENTRENCHED. HE STATE THAT HE FELT "HORRIBLE", "ANGRY", "BITTER"
AND THAT HE "HAD NO FUTURE FOR ADVANCEMENT." HE WAS PARTICULARLY ANGRY
THAT IN THE FACE OF THE COMPANY'S SQUANDERING OF MONEY AND GREEDY
DIVERSION OF FUNDS TO THEMSELVES, HE CONTINUED TO BE UNDERPAID AS WELL AS
DISRESPECTED BY MANAGEMENT. MR. MAIRENA INDICATED THAT IN JUNE OF 2003 HE
THEN DECIDED IN ANGER, THAT "YOU'VE BEEN FUCKING ME, I'M GOING TO FUCK YOU
BACK." HE INDICATED ALSO THAT HE WAS FEELING HIS UNDERPAYMENT STATUS MORE
ACUTELY BECAUSE HIS WIFE HAD LOST HER JOB AND THEY WERE NOW HAVING TO GET
BY ON ONE INCOME, RATHER THAN THEIR JOINT INCOME. HE INDICATED THAT THIS
SITUATION CONTRIBUTED TO HIS ALREADY INTENSE SENSE OF ANGER AT HIS
EMPLOYER. MR. MAIRNEA INDICATES THAT AT THIS POINT HE JUST "QUIT ON [HIMSLEF]"
AND BEGAN EMBEZZELING FUNDS FROM THE COMPANY. MR. MAIRENA INDICATES
THAT HE DID NOT CONSIDER THE CONSEQUENCES AND THAT HE WAS INTENT ON
SCREWING HIS EMPLOYER AND WITH THE SATISFACTION THAT THEY DID NOT EVEN
KNOW THAT THEY WERE BEING SCREWED. HE ADMITS THAT HE KNEW WHAT HE WAS
DOING WAS WRONG BUT HE FELT THEY DESERVED WHAT THEY WERE GETTING IN

RETURN FOR THEIR DISREGARD OF HIM AS A HARD WORKING EMPLOYEE IN THE COMPANY WHO WAS DISCRIMINATED AGAINST, UNDERPAID, AND UNDER VALUED.

MR. MAIRENA INDICATED THAT HE HAD HAD PRIOR SUCCESSFUL EMPLOYMENT EXPERIENCES IN HIS HISTORY WITH CAF USA, WHERE HE WORKED AS A COMPTROLLER FOR ONE AND ONE HALF YEARS WITH A SALARY OF $70,000; WITH PUBLIC ALLIES WHERE HE WORKED AS A COMPTROLLER FOR FIVE YEARS WITH A SALARY OF $55,000; AND WITH MBS, INC. WHERE HE WORKED AS A COMPTROLLER WITH A SALARY OF $40,000. IN THIS EMPLOYMENT HISTORY HE INDICATED THAT HE GREW SUCCESSFULLY AS AN EMPLOYEE AND HAD NO DIFFICULTIES. HE DENIES ANY DIVERSION OF FUNDS TO HIMSELF IN THESE EMPLOYMENTS.

### HISTORY OF PAST ILLNESS:

PSYCHIATRIC:   NONE
MEDICAL:   NONE
ALLERGIES:   NONE
HEAD INJURIES WITH LOSS OF CONSCIOUSNESS:   NONE
SEIZURES:  NONE
SURGICAL: HEMORRHOIDECTOMY IN DECEMBER 2004 AT INOVA FAIRFAX HOSPITAL; HERNIATED LUMBAR DISC WITH CHIROPRACTIC TREATMENT (LAST TREATMENT OCTOBER OF 2005)

### SUBSTANCE ABUSE:

ALCOHOL:   NO ABUSE BUT DRINKS SOCIALLY UP TO 3 TO 4 BEERS PER WEEK
ILLICIT DRUGS:   NONE
PRESCRIPTION DRUGS:   NONE
NICOTINE:  NONE
CAFFEINE:   CONSUMES TWO CUPS OF COFFEE PER DAY.

### FAMILY HISTORY:

CURRENT FAMILY: MR MAIRENA HAS BEEN MARRIED FOR 13 YEARS TO A WIFE WHO IS AND EXECUTIVE AND CEO OF THE AMERICAN ASSOCIATION FOR HOME CARE AND IS A CERTIFIED PUBLIC ACCOUNTANT BY TRAINING. HE REPORTS HAS A PRESENT SUBSTANTIAL INCOME AND THAT THEY HAVE NO FINANCIAL OR MARITAL PROBLEMS. HE REPORTS THAT THEY HAVE TWO DAUGHTERS FROM THE MARRIAGE AGES 10 ½ MONTHS AND 8 YEARS AND THAT BOTH CHILDREN ARE HEALTHY AND WITHOUT PROBLEMS. HE REPORTS A GOOD RELATIONSHIP WITH HIS CHILDREN.

NUCLEAR FAMILY:  MR. MAIRENA'S MOTHER IS LIVING AT AGE 65 YEARS, RUNS A DAY
CARE CENTER, AND HAS NO PROBLEMS. HIS FATHER IS LIVING AT 68 YEARS OF AGE AND
HAS A HISTORY OF PAST ALCOHOL ABUSE AND RELATED GASTROINTESTINAL BLEEDING.
HIS FATHER IS A MUNICIPAL PARKS MANAGER. MR. MAIRENA HAS THREE SIBLINGS,
BROTHERS 43 AND 41 YEARS, AND A SISTER 39 YEARS OF AGE. MR. MARIENA DENIES ANY
HISTORY OF PSYCHIATRIC, ALCOHOL, ILLICIT DRUG USE, OR SIGNIFICANT MEDICAL
PROBLEMS IN HIS SIBLINGS. HE DOES REPORT DEATH FROM ALCOHOL ABUSE OF HIS
PATERNAL GRANDFATHER AT AGE 40 YEARS WHEN HE WAS RUN OVER BY A TRUCK
WHILE INTOXICATED. HE ALSO REPORTS THAT HE HAS 4 PATERNAL UNCLES AND 3
PATERNAL AUNTS WHO HAVE ALCOHOL ABUSE PROBLEMS. HE DENIES ANY KNOWN
PSYCHIATRIC, SUBSTANCE ABUSE, OR SIGNIFICANT MEDICAL PROBLEMS IN HIS
EXTENDED MATERNAL FAMILY.

## MENTAL STATUS EXAMINATION:

JUDGMENT:     MR. MAIRENA'S JUDGMENT IS GROSSLY INTACT EXCEPT FOR
INDICATIONS THAT HE MAY IGNORE LIMITATIONS AND HIS OWN SELF INTEREST AT
TIMES. WHEN ASKED WHAT HE WOULD DO IF IN A THEATRE WHICH WAS ON FIRE HE
STATED HE WOULD TRY TO "SAVE PEOPLE". WHEN ASKED WHAT HE WOULD DO IF HE
FOUND AN ENVELOPE IN THE STREET WHICH WAS STAMPED AND ADDRESSED, HE
STATED THAT HE WOULD "MAIL IT OR DELIVER IT". WHEN ASKED WHAT HE WOULD DO
IF THE ENVELOPLE HAD A $100 BILL IN IT WHICH HE COULD SEE THROUGH THE
ENVELOPE HE STATED THE WOULD STILL MAIL IT OR DELIVER IT. HE GAVE AS A
SUPPORTING EXAMPLE THAT HE RECENTLY RETURNDED A WALLET WHICH HE FOUND IN
A PARKING GARAGE AND WHICH CONTAINED CASH AND CREDIT CARDS BELONGING TO
ITS ATTORNEY OWNER. THERE ARE INDICATIONS HOWEVER THAT HIS EMOTIONS MAY
SIGNIFICANTLY INFLUENCE HIS JUDGMENT AND HE MAY NOT FULLY UNDERSTAND HIS
LIMITATIONS THEREBY TAINTING HIS JUDGMENT.
INTELLIGENCE(7'S, +, -, x, /,digits, letters,words):  HIS INTELLIGENCE IS ABOVE AVERAGE AS
TO GENERAL COMPUTATIONAL AND VERBAL ABILITIES. HOWEVER, HE MADE
SEQENCING ERRORS NAMING LETTERS IN REVERSE (THOUGH HE LATER CORRECTED
THESE) AND WHEN NAMING 4 WORDS IN REVERSE (WHICH HE DID NOT CORRECT). THESE
RESPONSES MAY BE DECREASED DUE TO HIS ANXIETY BUT ALSO MAY REFLECT
ATTENTIONAL DEFICIENCIES THOUGH MILD.
MEMORY (i r, p):   HIS MEMORY WAS ADEQUATE FOR IMMEDIATE, RECENT, AND PAST
EVENTS.
MOOD: HIS MOOD DEMONSTRATED MIXED DEPRESSION AND ANXIETY.

ORIENTATION:  HE MADE MINOR ERRORS IN TIME ORIENTATION STATING IT WAS "THURSDAY, FEBRUARY 22, 2006" WHEN IN FACT IT WAS WEDNESDAY. THIS MAY HAVE REFLECTED HIS ANXIETY.  HE WAS ADEQUATELY ORIENTED TO PLACE AND PERSON.
THOUGHT PROCESS: HIS THOUGHT PROCESSES WERE INCREASED SOMEWHAT IN RATE AND WERE HIGHLY OBSESSIONAL IN NATURE WITH SOME TANGENTIALITY.
THOUGHT CONTENT(R,H,D,S,Hom,Ass,Abs) :    HIS THOUGHT CONTENT DEMONSTRATED ADEQUATE REALITY ORIENTATION. THERE WAS NO EVIDENCE OF HALLUCINATIONS OR FRANK DELUSIONS. MARGINAL, POSSIBLE UNDERLYING SUSPICIOUS TRENDS IN HIS THINKING WERE PRESENT AND HE WAS GUARDED ABOUT THE EXPRESSION OF SOME OF HIS FEELINGS.  HE WAS EXPERIENCING SOME SUICIDAL IDEATION WITH NO IMMEDIATE INTENT TO ACT, BUT OF CONCERN, NONETHELESS, GIVEN THE REALTIY OF HIS CIRCUMSTANCES. HE DENIED ANY HOMICIDAL IDEATIONS. HIS SIMPLE LOGICAL ASSOCIATIONS WERE FAIR TO GOOD BUT NOT AS SUPERIOR AS ONE WOULD EXPECT GIVEN HIS EDUCATION AND ACCOMPLISHMENTS. SIMILARLY, HIS ABSTRACTIVE ABILITIES WERE ONLY FAIR AND NOT AS SUPERIOR AS ONE WOULD EXPECT GIVEN HIS EDUCATION AND ACCOMPLISHMENTS. HE WAS CIRCUMSTANTIAL AT TIMES.
SPEECH:  HIS SPEECH WAS MILDLY PRESSURED AT TIMES BUT HE WAS ABLE TO REPEAT 'R' WORD AND 'S' WORD IN ALITERATIONS ADEQUATELY.  THERE WAS NO DYSARTHRIA AND HE WAS ARTICULATE, ALBEIT OBESSIONAL IN HIS EXPRESSIONS.
INSIGHT:  HIS INSIGHT WAS LIMITED INTO HIMSELF, AND HE DID NOT HAVE ADEQUATE UNDERSTANDING AS TO HOW HE COULD HAVE ACTED IN A MANNER SO RESPONSIVE TO HIS PROFOUND ANGER, BUT ALSO SO CONTRARY TO HIS PREVIOUS BEHAVIOR AND CHARACTER. WHEN ASKED TO EXPLAIN HOW HIS LIFE HAD COME TO THIS POINT AND TO DO SO IN ONE SENTENCE HE STATED, " I WANTED TO RIGHT THE SHIP." IT WAS APPARENT THAT HE DID NOT FULLY UNDERSTAND HIS OWN EMOTIONS AND PARTICULARLY DID NOT UNDERSTAND THEIR INFLUENCE UPON HIS THOUGHT PROCESSES. THERE WERE INDICATIONS HE COULD INDULGE HIMSELF IN UNTOWARD RATIONALIZATIONS AND INTELLECUALIZATIONS WHICH NEVERTHELESS DID NOT ADEQUATELY APPRECIATE THE REALITY OF CIRCUMSTANCES, RISKS, AND CONSEQUENCES. THERE WERE ALSO INDICATIONS THAT HE MAY NOT HAVE FULLY APPRECIATED HIS OWN LIMITATIONS.
GROOMING: HIS GROOMING AND APPEARANCE WERE DECIDEDLY ABOVE AVERAGE AND APPROPRIATE.
AFFECT: HIS AFFECT WAS ANXIOUS. HIS AFFECT WAS APPROPRIATE AND CORRELATED WITH HIS THOUGHT CONTENT.
BEHAVIOR:  HIS BEHAVIOR WAS APPROPRIATE BUT ANXIOUS.
OBJECT RELATIONS:    MR. MAIRENA RELATED TO THE EXAMINER IN AN APPROPRIATE

9

AND RESPECTFUL MANNER. HE DOES HAVE A TENDENCY TO WANT TO CONTROL
INTERPERSONAL INTERACTIONS AND AT TIMES REQUIRED SOME REDIRECTIONS. THIS
QUALITY OF RELATEDNESS IS CONSITENT WITH HIS OBSESSIONAL CHARACTERISTICS.
HE IS NOT, HOWEVER, FULLY IN TOUCH WITH HIS ANGER. WHEN ASKED TO IDENTIFY
WITH AN ANIMAL OF HIS CHOICE, HE IDENTIFIED WITH A "HAWK" , THE AESTHETICS OF
WHICH HE ADMIRED, AND WITH A "PUMA" BECAUSE THEY ARE, SLICK AND STEALTHY.
THE COMBINATION OF IDENTIFICATIONS WITH A "HAWK" WHICH PROVOKES IMAGES OF
POTENTIAL AGGRESSIVITY AND OF THE "PUMA" WHICH IS FAST AND STEALTHY AND
POTENTIALLY AGGRESSIVE ALSO, SUGGEST RELATEDNESS ISSUES IN MR. MAIRENA'S
PERSONALITY WHICH HE DOES NOT FULLY UNDERSTAND AND WHICH MAY HAVE SOME
RELEVANCE TO THE COMMISSION OF HIS MISDEEDS.

**DIAGNOSIS (DSM-IV):**

    AXIS I:  DEPRESSION NOS
          RULE OUT LATENT MAJOR DEPRESSIVE DISORDER OR BIPOLAR DISORDER

          ANXIETY DISORDER NOS

    AXIS II:  OBSESSIVE COMPULSIVE PERSONALITY DISORDER

    AXIS III:  PAST HEMORROIHDECTOMY
          PAST LUBMAR DISC HERNIATION

    AXIS IV:  LEGAL AND EMPLOYMENT PROBLEMS (PRIOR EMPLOYER)

    AXIS V:  GAF 75

**RECOMMENDATIONS:**

1.) IT IS RECOMMENDED THAT MR. MAIRENA HAVE PSYCHOTHERAPY AND PROBABLE
SHORT TERM PHARMACOTHERAPY TO ASSIST HIM IN FURTHER EVALUATION AND
TREATMENT OF HIS ACUTE PSYCHIATRIC CRISIS AND HIS LONGER TERM PSYCHIATRIC
DIFFICULTIES, AND PURUSANT TO HIS AGREEMENT AND THAT OF HIS COUNSEL, HE HAS
ACCEPTED SUCH A REFERRAL AND REFERRAL SOURCES FOR TREATMENT HAVE BEEN
EXTENDED TO HIM;

2.) PSYCHOLOGICAL TESTING TO EVALUATE THE POTENTIAL FOR AN UNDERLYING
MAJOR MOOD DISORDER IS ADVISED, AND TO EVALUATE ANY VULNERABILITY FOR
ALCOHOL ABUSE AND / OR IMPULSIVE AND / OR ANTI-SOCICAL TRAITS CO-MORBID WITH
SUCH DISORDERS IS ALSO ADVISED.

**RESPECTFULLY SUBMITTED,**

**SIDNEY C. BROOKS, M.D.**

*2-22-06*
**DATE**